The STATE of Ohio,Appellee,

v.

GIRTS, Appellant.

[Cite as *State v. Girts* (1997), 121 Ohio App.3d 539.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 69570 and 69572.

Decided July 24, 1997.

540

542

544

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Timothy G. Dobeck,* Assistant Prosecuting Attorney, for appellee.

*John P. Parker,* for appellant.

PATTON, Judge.

The grand jury returned a one-count indictment charging defendant Robert Girts with the aggravated murder of his wife, decedent Diane Girts. A jury found defendant guilty, but this court reversed the conviction on grounds that the trial court should have granted a mistrial when the state questioned defendant about an alleged jailhouse confession without having a good faith basis upon which to conduct that line of inquiry. See *State v. Girts* (July 28, 1994), Cuyahoga App. No. 65750, unreported, 1994 WL 393678. On retrial, a jury again found defendant guilty of aggravated murder.

The state's evidence showed that defendant and decedent lived in a house that adjoined the funeral home where defendant worked as a funeral director and embalmer. On the morning of September 2, 1992, defendant and several others began driving back from Chicago to Parma after having assisted in moving defendant's brother. Decedent remained at home, being scheduled to work at noon that day. When she did not arrive at work on time, a co-worker telephoned the funeral home and expressed her concern over decedent's unusual tardiness. A funeral home employee noticed decedent's car in the driveway, so he checked the house. The employee found the screen door open and called into the house. When decedent failed to respond, he entered the house and discovered her body slumped over in the bathtub.

The police found no evidence of foul play nor any obvious sign of suicide. A razor floating on the bath water, a hot curling iron resting on a nearby dressing table, and the couples' dog roaming in the yard led the police to conclude that decedent had died suddenly while bathing. Because the police could not readily determine a cause of death, they transported the body to the coroner's office for an autopsy.

During the autopsy, the coroner's office noted no obvious cause of death. The coroner did find an undigested meal of pasta salad in decedent's stomach, and recognized lividity or reddening of the skin which would typically be found in a person exposed to carbon monoxide. Carbon monoxide testing, however, showed no significant levels. The coroner listed no cause of death.

Around September 20, 1992, defendant telephoned the police and told them that he had found a note, hand-written by decedent, which might explain her death. The undated note stated, "I hate Cleveland. I hate my job. I hate myself." Defendant explained that he found the note underneath some papers in his brief case. He told police that decedent had been despondent over their recent move to the Cleveland area. She had difficulty finding work and worried that she had a weight problem. Defendant also told the police that decedent

suffered three miscarriages and had been trying to come to grips with the thought that she might not be able to bear children.

At about the same time, the coroner ordered department toxicologists to perform additional tests on body fluids taken from decedent, specifically asking them to detect the presence of any poisons. An initial test for the presence of potassium cyanide had to be discarded when the toxicologist discovered that reagents used in the testing process had been compromised. New reagents were obtained and the toxicologist obtained a positive result for cyanide at about twice the minimum lethal dose. The coroner verified this result by asking the Franklin County Coroner's Office to test for the presence of cyanide by using a different methodology. The Franklin County Coroner obtained virtually identical results. The coroner then listed the cause of death as homicide.

The police returned to defendant's house and executed a search warrant, pointedly telling defendant that they were looking for cyanide or other poisons. Defendant cooperated with the search, but the police found nothing. The police questioned the funeral home operators about the possible use of cyanide in the embalming process, but found no evidence that the funeral home had received cyanide from any of its suppliers. A funeral home director later recalled a conversation with defendant in which they discussed how the police investigated funeral home supply shipments for deliveries containing cyanide and defendant said, "That is not where I got it from."

The evidence did not show that the police had any suspects until they broadcast a plea for assistance with a television crime watch service. As a result of that broadcast, defendant's commanding officer in the Army reserves came forward in January 1993 with information that she had sent defendant two grams of potassium cyanide. She explained that defendant knew that she worked as a chemist in her civilian job and that in the spring of 1992, he asked her if she could supply him with a small amount of cyanide for use in controlling groundhogs on his property. The commanding officer did not immediately send the cyanide. She later discovered that defendant had left his business card on her desk. A notation on the card, in defendant's handwriting stated, "Thank you for your help." In the lower corner of the card defendant wrote "KCN," the chemical abbreviation for potassium cyanide. The card reminded the commanding officer of defendant's request, so she sent "a couple of grams" of cyanide to the funeral home address listed on defendant's business card. The commanding officer explained that she came forward with the information after learning that defendant's wife had died as a result of cyanide poisoning.

When confronted with evidence that he had obtained cyanide, defendant told the police that he had used the cyanide to control groundhogs on the property. A funeral home employee, however, insisted that he had no knowledge of a

groundhog problem, and produced records showing that squirrels were the only pest control problem on the property. The city pest control officer stated that he had no complaints about groundhogs. A representative from a pest control company conceded that cyanide might have been used for pest control well in the past, but that in ten years of business, she had not used any products containing cyanide.

Other persons came forward with information that soon corroborated police suspicion on defendant. A business associate recalled a conversation in which defendant abruptly interrupted her to ask if she could show him the measurement of a gram. When the business associate asked why he needed this information, defendant said that he needed to measure some medicine for his dog's food. Defendant's veterinarian, however, stated that he prescribed no medication for the dog that would require any kind of measuring.

A colleague at the funeral home described a conversation in which he said that defendant had told him that decedent committed suicide. When the colleague wondered how decedent could procure cyanide, defendant responded that "she probably got it down on West 25th Street where she worked because she came in contact with a lot of low lifes." In a subsequent conversation, the colleague again wondered how decedent could have obtained the cyanide, and this time defendant said, "Someone at the coroner's office probably spilled some of it because they keep it there."

Another funeral home colleague testified that when the ambulance came to transport decedent's body, defendant yelled to the drivers that they should take the body to Parma General Hospital. The police learned that defendant had previously worked for the Lorain County Coroner. His experience there would tell him that all deaths occurring without any known natural cause would ordinarily be investigated by the coroner's office, which ordinarily performed more complete autopsies than hospitals.

The police also began to question decedent's motivation to commit suicide. Several close friends told the police that they had spoken with decedent shortly before her death and found her in good spirits. The friends found nothing unusual about her behavior and noted that decedent was looking forward to moving into a house she and defendant recently purchased. One friend did, however, say that she had met with defendant shortly before decedent's death and he told her that decedent was depressed about living in Cleveland. This statement contradicted the friend's perceptions. Just three days before her conversation with defendant, the friend spent the weekend with decedent and defendant and found nothing unusual about decedent's demeanor.

The state settled on two factors motivating the murder. First, it discovered that defendant had had a fitful affair with another woman who would not continue

the affair as long as defendant remained married. Defendant and the woman first became involved for a short period in 1980, but the woman broke off the affair because she had discovered defendant lying about his marital status with a previous wife. The affair resumed briefly in either 1985 or 1986, but ended shortly by mutual agreement. It resumed again in February 1992. Defendant told the woman that he was married, but that he and his wife were divorcing and expected to finalize the divorce in July 1992. The intimate portion of their relationship ended in late May 1992, although they remained in contact for several more months. Defendant stipulated that he was not a party to any divorce action.

Defendant called this woman shortly after decedent's death and informed her that decedent had died from an aneurysm. They spoke twice thereafter and, in the early part of October 1992, the woman received an early morning telephone call from defendant in which he said, "Miss Bethea, this is Robert Girts. We'll have to put the decorating of my house on hold. Something really bizarre has happened." When the woman asked what happened, defendant replied, "I'm being investigated for my wife's death." He then hung up. The woman found this conversation unusual because defendant had never referred to her as "Miss" and because, while she had worked as an interior designer, she had not discussed decorating the interior of defendant's house.

The woman then called the police and informed them of her conversation with defendant. Defendant telephoned her late that evening. When he heard that she had telephoned the police and that they would be coming to question her, he said there was no harm in her doing design work for him and she should "be brief" during questioning.

The second motivating factor arose from defendant's financial status. Defendant stipulated that he had received just over $50,000 as proceeds from life insurance policies taken on decedent's life. The state tied this money to defendant's purchase of a house and his desire to invest $10,000 and become a silent partner in another funeral home.

Defendant's case consisted primarily of evidence showing that he had been in Chicago at the time of decedent's death (a fact the state did not dispute) and expert testimony rebutting the state's findings relating to the manner and cause of death.

Defendant's sister-in-law testified that she ate from a bowl of pasta salad she had found in defendant's refrigerator and suffered no ill effects.

Defendant's expert testified that he would have listed the cause of death as "undetermined" because in his opinion the level of cyanide found in decedent's body did not correspond with the classic signs of cyanide poisoning that he would

have expected to find. The expert testified that cyanide basically poisons all the cells in the body to the point where they cannot use oxygen. Because the cells cannot use oxygen, the blood becomes superoxygenated, thus giving the body its reddish appearance. The cyanide victim can breathe, but nonetheless experiences the sensation and effects of asphyxiation. The onset of cyanide poisoning is marked by dizziness or faintness with rapid breathing. Convulsions, palpitations, or seizures may follow before the victim falls into a coma and dies.

The outward indicia of cyanide ingestion include burning around the mouth and throat area, uniform lividity of other major internal organs, petechiae or small bleeding points usually found in the stomach, involuntary release of both urine and fecal matter, and collection of fluid in the lungs. Of these signs, only the lividity and collection of fluid in the lungs were present. The expert thought that the lividity and collection of fluid, however, could be explained by other factors, such as the immediate refrigeration of the body after being taken from warm water.

I

The first assignment of error and defendant's *pro se* assignment of error "A" complain that the trial court erred by failing to grant defendant's motion to dismiss on grounds of double jeopardy. Defendant argues that this court reversed the previous conviction because the state had exhibited bad faith trial tactics that goaded him into seeking a mistrial. Under those circumstances, he maintains that a subsequent prosecution should be barred.

As an initial matter, defendant asks that we review this assignment separately under both the United States and Ohio Constitutions. While the states are free to interpret their own constitutions to afford greater protection than that provided by the United States Constitution, the Ohio Supreme Court has recently stated that "Ohio courts have historically treated the protections afforded by the Double Jeopardy Clauses of the Ohio Constitution and the United States Constitution as coextensive." *State v. Gustafson* (1996), 76 Ohio St.3d 425, 432, 668 N.E.2d 435, 441. Given existing precedent from the Supreme Court, we find no reason to expand the constitutional protection afforded under the Ohio Constitution.

A component of the Double Jeopardy Clause to the Fifth Amendment is the protection of the criminal defendant's right to have his case finally decided before the first jury impanelled to try him. *Oregon v. Kennedy* (1982), 456 U.S. 667, 673, 102 S.Ct. 2083, 2088, 72 L.Ed.2d 416, 422–423. The state is ordinarily not barred from retrying a criminal defendant again when the first prosecution has terminated upon the defendant's own motion for a mistrial. *United States v.*

*Tateo* (1964), 377 U.S. 463, 467, 84 S.Ct. 1587, 1589–1590, 12 L.Ed.2d 448, 451–452; *State v. Loza* (1994), 71 Ohio St.3d 61, 70, 641 N.E.2d 1082, 1096–1097. There is a narrow exception to that rule, however, that applies when the defendant's request for a mistrial is prompted by prosecutorial misconduct designed to goad the defendant into requesting the mistrial. *Kennedy, supra,* 456 U.S. at 676, 102 S.Ct. at 2089–2090, 72 L.Ed.2d at 424–425; *State v. Glover* (1988), 35 Ohio St.3d 18, 517 N.E.2d 900, syllabus.

 Prosecutorial misconduct, by itself, is not enough to trigger the exception to the Double Jeopardy Clause—the state must intend "to subvert the protections afforded by the Double Jeopardy Clause." *Kennedy* at 676, 102 S.Ct. at 2089, 72 L.Ed.2d at 424. In other words, only conduct "intentionally calculated to cause or invite mistrial" will bar retrial. *United States v. Thomas* (C.A.6, 1984), 728 F.2d 313, 318. In determining whether the requisite prosecutorial intent was present, a reviewing court may consider the following factors: (1) whether there was a sequence of overreaching prior to the single prejudicial incident; (2) whether the prosecutor resisted or was surprised by the defendant's motion for a mistrial; and (3) the findings of the trial and appellate courts concerning the intent of the prosecutor. *Kennedy,* 456 U.S. at 680, 102 S.Ct. at 2092, 72 L.Ed.2d at 427 (Powell, J., concurring).

 In its cross-examination of defendant in the first trial, the first question the state asked defendant was whether he had told a fellow prisoner in the county jail that he killed his wife, but the state would never be able to prove it. The court overruled an objection to the question and directed defendant to answer. Defendant replied in the negative, disavowing any knowledge of the prisoner.

At proceedings held in chambers at the conclusion of defendant's testimony in the first trial, the trial judge explained that he had overruled the objection because the state represented that it would place the prisoner on the witness stand. The defense asked for either a mistrial or a one-day continuance to prepare for the prisoner as a rebuttal witness. The state objected to a one-day continuance, stating that anything more than half a day would be "inappropriate." The court decided to grant a continuance for one day, although it admitted that one day "is probably too short but it's all I'm prepared to give."

The parties went off the record and discussed the situation. When they came back on the record, the state announced that it would not call the prisoner as a rebuttal witness because it believed that "the length of time that the defense would get in order to examine this witness would take away from the jury." The state believed that it had a good faith basis for asking the question and offered to bring in the prisoner's attorney to place on the record the basis in fact for the

question. However, it believed as a strategic matter that a continuance would reflect badly on its case.

Defendant strenuously objected, claiming that regardless whether the state thought it had a good faith basis for asking the question, it had denied the defense the opportunity to cross-examine the prisoner. It argued that the state's question, left hanging before the jury, vouched for the truth of what defendant had allegedly had said to the prisoner.

The court noted that it had permitted defendant to answer the question "based on the representation at side bar of the prosecution that they had the rebuttal witness and they intended to go forward with him." The court further recognized that the state later decided not to call the prisoner as a rebuttal witness for "strategic reasons." The court found that the state had a good faith basis for asking the question because it had intended to call the prisoner at the time it. asked the question. It overruled the motion for a mistrial.

In analyzing the substantive basis for the state's question, this court found it "obvious" from the state's tactics that it did not have a good faith basis to ask the question. *Girts, supra*, unreported, at 26. While recognizing that good faith is entirely subjective, this court found that the defense had suffered prejudice and ruled that the trial court abused its discretion by failing to grant the motion for a mistrial. *Id.* at 27.

Despite this court's earlier conclusions, we cannot say that the state intended to goad defendant into asking for a mistrial. Considering the factors set forth in Justice Powell's concurring opinion in *Kennedy*, 456 U.S. at 679–680, 102 S.Ct. at 2091–2092, 72 L.Ed.2d at 427, we find that the first two factors favor the state. First, we find (and defendant does not argue otherwise) that there was no sequence of overreaching prior to the state's asking defendant about the fellow prisoner. Second, the state did oppose the motion for a mistrial in the first trial, so it cannot reasonably be said that the state goaded defendant into making the motion for a mistrial solely to remove the case from the jury and thus violate defendant's constitutional rights.

As to the third factor, the "bad faith" in asking defendant about a conversation with the fellow prisoner is not the same as establishing the state's motive to cause a mistrial. In fact, *Kennedy* specifically rejected "bad faith conduct" as a test for determining whether the government intended to provoke a mistrial. 456 U.S. at 674, 102 S.Ct. at 2088–2089, 72 L.Ed.2d at 423–424. Instead, the court stated:

"[W]e hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial *was*

*intended to provoke the defendant into moving for a mistrial."* (Emphasis added.) *Id.* at 679, 102 S.Ct. at 2091, 72 L.Ed.2d at 427.

One might reasonably presume that, where the prosecution seeks to force a mistrial, it does so because it is unhappy with the progress of the trial. *Greyson v. Kellam* (C.A.9, 1991), 937 F.2d 1409, 1413. But there is no indication on the record before us that the state goaded defendant into moving for a mistrial solely for this reason. Instead, we find that the error committed by the state during the first trial resulted from its aggressive prosecution of the matter. As in any contested matter, mistakes will be made. While some mistakes might be serious enough to warrant a mistrial, they do not necessarily invoke the protections of the Double Jeopardy Clause. *Kennedy,* 456 U.S. at 674–675, 102 S.Ct. at 2088–2089, 72 L.Ed.2d at 423–424.

■ Aside from defendant's bald assertions, nothing up to that point in trial suggested any possible reason for the state to try to terminate the trial. Perhaps the state should have called the prisoner in its case-in-chief, but this court rectified that error by ordering a new trial. In any event, this omission simply constituted negligence on the part of the state, and negligence will not suffice to show intent to force a mistrial. *United States v. Dennison* (C.A.10, 1989), 891 F.2d 255, 258.

Upon consideration of all the objective facts and circumstances in this case, as well as the factors enumerated in *Kennedy,* we find that the state did not intend to goad defendant into seeking a mistrial; therefore, defendant's double jeopardy rights were not violated. The first assignment of error is overruled.

## II

The second assignment of error complains that the trial court erred by denying defendant's motion to dismiss the indictment on speedy trial grounds. Defendant raises two arguments. First, he claims that the state's appeal of this court's ruling to the Ohio Supreme Court was nothing more than a delaying tactic and lacked no reasonable basis. Second, he claims that an unreasonable amount of time elapsed between the Supreme Court's refusal to certify the record and his retrial.

■ The speedy trial provisions of R.C. 2945.71 do not apply to retrials. *State v. Fanning* (1982), 1 Ohio St.3d 19, 21, 1 OBR 57, 58–59, 437 N.E.2d 583, 585. Instead, we consider the reasonableness of the length of time it takes to convene a retrial. *Id.; State v. Fields* (1991), 75 Ohio App.3d 123, 127, 598 N.E.2d 1264, 1266–1267. Relevant factors are (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his speedy trial rights; and (4) the prejudice to defendant. See *Barker v. Wingo* (1972), 407 U.S. 514, 530, 92

S.Ct. 2182, 2192, 33 L.Ed.2d 101, 116–117. When considering the issue of delay, the speedy trial statute, while not controlling for retrial purposes, may nonetheless assist us in determining what is reasonable under the circumstances. *Fanning*, 1 Ohio St.3d at 21, 1 OBR at 58–59, 437 N.E.2d at 585.

Defendant initially argues that we should compute the delay from the time we reversed the first conviction, rather than from the Supreme Court's refusal to hear defendant's appeal. He claims that any attempt by the state to appeal further the reversal would have demonstrated bad faith given this court's unanimous decision to reverse the conviction.

■ We find no basis in the record to conclude that the state's appeal to the Ohio Supreme Court was a delaying tactic. Aside from the conclusory nature of this argument, the argument ignores the state's right to appeal an adverse ruling to the Supreme Court. While this court may have unanimously reversed the first conviction, that fact standing alone would not prevent the state from exercising its right to seek further review and would certainly not justify a blanket finding of bad faith. Therefore, we find that the time for computing the reasonableness of any delay in bringing the retrial must commence from the time the Supreme Court refused a further appeal of the first conviction. See *State v. Montaz–Pagan* (Oct. 11, 1996), Trumbell App. No. 96–T–5451, unreported, 1996 WL 648733; *State v. Zerla* (Dec. 22, 1994), Franklin App. No. 94APA03–350, unreported, 1994 WL 714458.

■ We find that the state did not delay unreasonably in bringing defendant to retrial. Importantly, defendant does not actually contest the date he actually went to trial (July 28, 1995); instead, he complains that his speedy trial rights were violated as of April 27, 1995, the date on which he filed his motion to dismiss.

Given our finding that any time required to prosecute an appeal to the Supreme Court would not count against the state, this assignment must fail. Initially, we note that while the Supreme Court issued its order refusing the state leave to appeal on January 18, 1995, the court of common pleas did not receive that notice until February 3, 1995. The newly assigned trial judge set the retrial for May 1, 1995. Thus, at the point when defendant asserted his speedy trial right, only eighty-seven days had elapsed.

The reasons for the delay, as we have noted, stem in part from the time needed to reassign the matter to a new judge. We also recognize that defendant filed pretrial motions for bail, discovery, a bill of particulars, appointment of counsel, investigators, and an expert witness. Although the provisions of R.C. 2945.72 would not apply directly to retrials, they do provide a benchmark for determining when motions filed by the defendant should be charged against the defendant.

We do find that defendant asserted his speedy trial rights in a timely manner.

The final factor, the prejudice to defendant, does not weigh in his favor. In the context of prejudice, *Barker* identified three interests of defendants that the speedy trial right was designed to protect: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. The most serious of these factors is the inability to prepare a defense.

We find nothing in the record to show that any delay prejudiced defendant's ability to prepare his defense. To the contrary, the delay permitted new counsel to familiarize himself with the facts of the case and conduct additional discovery. Although it is not precisely relevant to the time frame involved in this assignment of error, we note that defense counsel later requested a continuance to obtain the services of the expert who testified for defendant. Clearly, at the point in time at which the trial court denied the motion to dismiss on speedy trial grounds, defendant was not prepared for trial.

It may be that defendant has suffered anxiety due to the fact that he continues to assert his innocence. We suppose all similarly situated defendants would make the same claim. The short answer is that the first jury rejected this asserted innocence, and this court did not reverse the initial conviction on evidentiary grounds. Defendant's anxiety under these circumstances is not compelling.

Upon consideration of the factors set forth in Barker, we find that the trial court did not err by denying the motion to dismiss on speedy trial grounds because the trial court did not delay unreasonably in setting the matter for trial. The second assignment of error is overruled.

### III

The third assignment of error complains that the trial court violated Crim.R. 24(F) by permitting two alternate jurors to enter the jury room and listen to the jury's deliberations. Defendant claims that the trial judge should have discharged the alternates.

The trial judge apparently decided on his own initiative to permit the alternate jurors to sit in on the jury deliberations:

"THE COURT: It has been discussed by all counsel that in light of the situation here that we would not release the alternates in this case, that, in fact, that the alternates will remain with the jury as they deliberate but will not participate in the deliberations, that they are to listen to all of the deliberations, that should something occur, should this go overnight, that we will not have to

recommence deliberations from square one, that the alternates would be up to speed and then be allowed to participate.

"It is the court's feeling in light of who the alternates are in this case that they could easily perform that function of listening without participating and be able then should we need to use them to be up to speed in the deliberations.

"It is my understanding there is no objection of behalf of the defendant?

"MR. TOBIK: That's correct.

"THE COURT: Or on behalf of the State?

"MR. WETZEL: Your Honor, the State of Ohio has indicated at side bar and again we would continue our objection to it, but we understand the court's logic and reasoning, but we have our reservations.

"THE COURT: Sure. Overruled. We will do it. There is no objection on behalf of the defendant. Bring the jury in."

 Crim. R. 24(F) provides that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." It is a general rule that alternates may not replace regular jurors after the jury retires to deliberate. *State v. Hutton* (1990), 53 Ohio St.3d 36, 46, 559 N.E.2d 432, 444. The general rule is not absolute—Ohio courts have recognized that, although expressed in mandatory terms, Crim.R. 24(F) does not state a *per se* cause for reversal. *State v. Blair* (1986), 34 Ohio App.3d 6, 516 N.E.2d 240; *State v. Miley* (1991), 77 Ohio App.3d 786, 603 N.E.2d 1070.

 It is a fundamental principle of appellate review that we will not review errors that could have been called to the court's attention at a time when the error could have been prevented or corrected by the trial court. See *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. Obviously, defendant did not object to the court's actions and cannot be heard to complain on appeal. *State v. Manning* (May 2, 1996), Delaware App. No. 95CAA07044, unreported, 1996 WL 248551.

Defendant, however, argues that his failure to object to the court's decision to permit the alternates to sit in on the jury deliberations should not be fatal to his argument and that we should adopt the *per se* standard of some federal courts that have considered the identical provisions of Fed.R.Crim.P. 24(c) and find plain error in permitting alternates to be present during jury deliberations.

The United States Supreme Court recently addressed the question whether a trial court erred by permitting two alternates to be present during jury deliberations. In *United States v. Olano* (1993), 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508, the district court permitted two alternate jurors to retire with the jury, but cautioned the alternates not to participate in deliberations. Olano did

not object. The court found that the express terms of Crim.R. 24(F) prohibit the presence of alternates in jury deliberations and any order to that effect would be a deviation from the rule. *Id.* at 737, 113 S.Ct. at 1779, 123 L.Ed.2d at 521–522. Noting that Olano failed to object to the presence of the alternates, the court went on to analyze the case for plain error under Fed.R.Crim.P. 52(b). The court stated, however, that "[i]t is a separate question whether such a deviation amounts to 'error' when the defendant consents to the alternates' presence." *Id.* This separate question is the issue raised in this assignment.

In *United States v. Cencer* (C.A.6, 1996), 90 F.3d 1103, the Sixth Circuit Court of Appeals addressed the question now before this court—whether a defendant could affirmatively waive the provisions of Fed.R.Crim.R. 24(c). On a Friday afternoon, the district court trying Cencer prepared to retire the jury for deliberations. Two jurors, however, could not remain on a panel if the deliberations extended into the following week. The district judge suggested allowing the alternates to sit in on jury deliberations and substitute them if necessary. Cencer expressly waived any objection to the court's suggestion. The alternates retired with the jury. At the close of the day, the jurors reached a partial verdict but did not finish all deliberations. Aware that two of their number could not remain on the panel, they asked the district judge for instructions. The district judge substituted the alternates, telling the jurors that the alternates would have to agree with any verdicts previously reached. Cencer objected to this instruction, but not to the substitution itself.

On appeal, Cencer argued that the district court had violated Fed.R.Crim.R. 24(c) by allowing the alternates to sit in on the jury deliberations. Citing Cencer's affirmative agreement to the substitution procedure, the Sixth Circuit characterized Cencer's attempts to find error "questionable at best, disingenuous at worst." *Id.* at 1106. The court went on to find that the better view would permit a defendant to waive the provisions of Fed.R.Crim.P. 24(c). Referring to various provisions of Fed.R.Crim.P. 23 which permit a defendant to waive the right to a jury or waive the right to a jury of exactly twelve persons, the Sixth Circuit found it equally reasonable to allow a defendant to waive Rule 24(c).

We agree with the Sixth Circuit. It is beyond argument that a criminal defendant may waive constitutional and statutory trial rights. See, *e.g., Boykin v. Alabama* (1969), 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 279–280. In *United States v. Mezzanatto* (1995), 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697, the court stated:

"Our cases interpreting the Federal Rules of Criminal Procedure are consistent with this approach. The provisions of those rules are presumptively waivable, though an express waiver clause may suggest that Congress intended

to occupy the field and to preclude waiver under other, unstated circumstances." *Id.* at 201, 115 S.Ct. at 801–802, 130 L.Ed.2d at 704.

Crim.R. 23, the Ohio analog to Fed.R.Crim.P. 23 cited by *Cencer,* is not identical to the federal rule, but Ohio case law nonetheless incorporates those aspects of Fed.R.Crim.P. 23 that *Cencer* found persuasive. The number of persons comprising a jury is a matter of procedure, not a substantive right; it is therefore subject to the rule-making authority of the Supreme Court. See *State ex rel. Columbus v. Boyland* (1979), 58 Ohio St.2d 490, 492–493, 12 O.O.3d 401, 402, 391 N.E.2d 324, 325–326. Although Crim.R. 23(B) specifies the number of jurors permitted for felony and misdemeanor trials, the rule is not absolute. See, *e.g., State v. Thomas* (1980), 61 Ohio St.2d 223, 15 O.O.3d 234, 400 N.E.2d 401 (providing a jury of twelve in a misdemeanor case, where a misdemeanant is jointly indicted and tried with a felon pursuant to Crim.R. 8, is not prejudicial to the rights of the misdemeanant). Ohio courts have not, to this point, found *per se* violations for Crim.R. 24(F), and defendant fails to offer any compelling reason for us to find a *per se* violation.

We therefore hold that when a defendant affirmatively consents to procedure which permits alternate jurors to sit in on, but not participate in, jury deliberations, that defendant waives the right to challenge the procedure under Crim.R. 24(F).

There may be very good reasons why a defendant might wish to waive the right to keep alternate jurors out of the jury deliberation room. In this case, the trial court's comments prefacing the decision to permit the jurors to sit in on jury deliberations indicate that defendant did so as a matter of expediency. The trial judge's reference to a "situation" presumably meant that some jurors would not be able to continue deliberations beyond a certain point in time. This was a lengthy trial and both the court and defendant could reasonably seek to minimize any possible delay that would ensue in the event a juror needed to be replaced.

Importantly, the trial judge gave the alternates a very specific instruction limiting their participation in the deliberations. The trial judge instructed the alternates:

"I will indicate to you that you are allowed to listen to all the deliberations. You are not allowed to participate other than to listen. Your alternate juror status remains. So, as you now begin to listen to the deliberations, without participating, in other words, no questions by you or responses, but I do want you to listen to the deliberations of your fellow jurors."

We presume that jurors follow the instructions of the court. *State v. Loza* (1994), 71 Ohio St.3d 61, 79, 641 N.E.2d 1082, 1102–1103. Moreover, the United States Supreme Court expressly rejected defendant's argument concerning a

"chilling" effect associated with the presence of alternates in deliberations. *Olano,* 507 U.S. at 740, 113 S.Ct. at 1781, 123 L.Ed.2d at 523–524. Having waived the right to dismiss the alternate jurors, defendant cannot be heard to argue any error. The third assignment of error is overruled.

## IV

The fourth assignment of error and *pro se* assignment "E" complain that defendant was denied the effective assistance of counsel when (a) counsel failed to object to the presence of alternate jurors in the jury room; (b) counsel failed to request that the trial court voir dire the testimony of the coroner; (c) counsel failed to object during closing argument; and (d) counsel failed to object to judicial bias.

In order to establish a claim of ineffective assistance of counsel, the burden is on the defendant to show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Johnson* (1986), 24 Ohio St.3d 87, 89, 24 OBR 282, 283–284, 494 N.E.2d 1061, 1063. The standard for determining deficient performance is whether counsel's performance fell below an objective standard of reasonableness. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. To show prejudice, a defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Id.* at paragraph three of the syllabus.

## A

Having found that it is not *per se* error for a trial judge to permit alternate jurors to remain in the jury room while deliberations occur, we must consider whether counsel's performance fell below an objective standard of reasonable representation.

The trial judge told both counsel for the defense and the state the following:

"It has been discussed by all counsel that in light of the situation in this case, that, in fact, that the alternates will remain with the jury as they deliberate but will not participate in the deliberations, that they are to listen to all of the deliberations, that should something occur, should this go overnight, that we will not have to recommence deliberations from square one, that the alternates would be up to speed and then be allowed to participate."

The record does not readily indicate why defense counsel agreed to permit the alternates into the jury room, but we presume from the court's statement that some situation existed which caused both the court and counsel to

worry that a juror might have to be excused if deliberations went on to a second day. If that was the case and defense counsel was satisfied with the composition of the jury, it would have been a matter of strategy to keep the jury together. *Strickland, supra,* 466 U.S. at 688–689, 104 S.Ct. at 2065, 80 L.Ed.2d at 693–695; *State v. Smith* (1991), 75 Ohio App.3d 73, 76, 598 N.E.2d 878, 880.

In any event, even if counsel's performance could be deemed deficient, we find no probability that were it not for counsel's errors, the result of the trial would have been different. Defendant fails to show actual prejudice from permitting the alternates to sit in on the jury deliberations.

In *Olano,* the Supreme Court considered that the presence of alternate jurors during jury deliberations might prejudice a defendant in one of two ways: "either because the alternates actually participated in the deliberations, verbally or through 'body language'; or because the alternates' presence exerted a 'chilling' effect on the regular jurors." 507 U.S. at 739, 113 S.Ct. at 1780, 123 L.Ed.2d at 523. The court then rejected both as a basis for finding prejudice, since Olano made no specific showing that the alternate jurors participated in the jury deliberations or "chilled" the deliberations of the other jurors. *Id.*

As in *Olano,* defendant submits nothing to suggest that the alternates ignored the trial judge's order to remain silent, or that they "chilled" the deliberations. Moreover, the court did give a very specific cautionary instruction to the alternates. *Id.* at 740, 113 S.Ct. at 1781, 123 L.Ed.2d at 523–524. Consequently, defendant fails to show how the verdict had been tainted by the presence of the alternate jurors.

## B

Defendant's second argument under this assignment is that counsel should have asked the court to voir dire the coroner on her qualifications to express an opinion on the manner of decedent's death. He claims that there is a complete absence of evidence on the scientific reliability of the coroner's analytical techniques.

In *Vargo v. Travelers Ins. Co.* (1987), 34 Ohio St.3d 27, 516 N.E.2d 226, the court stated that "[t]he coroner is a medical expert rendering an expert opinion on a medical question." *Id.* at 30, 516 N.E.2d at 229. There is no doubt that the coroner established her credentials as an expert witness, stating that she had performed over one thousand autopsies. Given this background, an objection to the coroner's qualifications would have been futile.

Although she could not immediately give a manner of death in her initial examination of decedent's body, the coroner did not have reason to consider that cyanide poisoning had been the cause of death. The outward markings on the

body suggested that death had occurred as a result of carbon monoxide poisoning. Once the police asked the coroner's office to test for the presence of cyanide, the coroner determined that there were lethal levels of cyanide in decedent's blood. A subsequent independent test verified the coroner's finding. Obviously, the independent testing validated the coroner's techniques.

### C

Defendant next argues that counsel rendered deficient performance by failing to object to remarks made by the state in its closing argument. Defendant maintains that the state impermissibly commented on his failure to testify.

The substance of this argument is addressed in our discussion of the tenth assignment of error below. For the reasons set forth there, we find that an objection to the closing argument would not have been well taken; therefore, counsel did not fail to perform to a reasonable standard.

### D

Defendant's final argument under this assignment is that counsel should have objected to various instances of judicial bias.

In *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph two of the syllabus states that "[c]hallenged statements and actions of the trial judge in a criminal case will not justify a reversal of the conviction, where the defendant has failed in light of the circumstances under which the incidents occurred to demonstrate prejudice." The court identified the following rules to be used in determining whether a trial judge's remarks were prejudicial: (1) defendant has the burden of proof to demonstrate prejudice; (2) it is presumed that the trial judge is in the best position to determine when a breach is committed and what corrective measures are called for; (3) the remarks are to be considered in light of the circumstances under which they were made; (4) the effect of the remarks have on the jury are to be considered; and (5) the possible effect of the remarks on the effectiveness of counsel is to be examined. *Id.* at 188, 7 O.O.3d at 365–366, 373 N.E.2d at 1248–1249.

Defendant has not carried his burden of showing just how the remarks prejudiced his defense. In fact, he simply lists page citations from the transcript, without explanation. We have reviewed the four citations and conclude that they were nothing more than good-natured banter between the trial judge and defense counsel. Placed in context, the remarks do not indicate any bias by the trial judge; consequently, an objection would have been pointless. The fourth assignment of error is overruled.

## V

The fifth assignment of error complains that the state failed to produce sufficient evidence to demonstrate the cause of death. Defendant argues that the forensic evidence of cyanide poisoning did not correspond to the classic physical signs that appear in the body of the typical cyanide poisoning victim.

In a murder prosecution under R.C. 2903.01, the state must prove that defendant purposely, and with prior calculation and design, caused the death of decedent. To meet this burden of proof, the state must present evidence of such a character that if believed, it would convince the average mind of the defendant's guilt beyond a reasonable doubt. The court must view the evidence in a light most favorable to the state and determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

The essential facts of the crime charged include the facts relating to the *corpus delicti*. The *corpus delicti* of a murder prosecution involves two elements: (1) the fact of death and (2) the existence of a criminal agency of another as the cause of death. *State v. Manago* (1974), 38 Ohio St.2d 223, 67 O.O.2d 291, 313 N.E.2d 10, paragraph one of the syllabus. There is no question that decedent did, in fact, die. The issue is whether the state's evidence was sufficient to show that decedent had died as a result of a criminal agency.

At trial, the coroner testified that test results showing that decedent had twice the minimum lethal level of cyanide in her body caused the coroner to form the opinion that decedent died as a result of a homicide. This factual determination concerning the manner of death created a nonbinding rebuttable presumption concerning such facts. *Vargo v. Travelers Ins. Co.*, 34 Ohio St.3d 27, 516 N.E.2d 226, syllabus; *State v. Heinish* (1990), 50 Ohio St.3d 231, 234–235, 553 N.E.2d 1026, 1030–1032.

Ordinarily, the coroner's opinion stands alone in a criminal case due to the average criminal defendant's failure to rebut the expert testimony by the coroner. *State v. Jacks* (1989), 63 Ohio App.3d 200, 208, 578 N.E.2d 512, 517. However, defendant presented an expert who attempted to cast doubt on the coroner's opinion by noting that several classic signs of cyanide poisoning were not present. The expert testified that if cyanide was ingested orally, he would expect to find evidence of burning due to the caustic nature of the poison. Additionally, the expert stated that the levels of cyanide found in decedent would normally affect the lividity of her internal organs, but the autopsy revealed nothing remarkable about those organs. The absence of these classic signs of cyanide poisoning led

the expert to form the opinion that cyanide poisoning could not conclusively be determined as the cause of death.

While the expert's opinion conflicted with that of the coroner, the issue here is whether the coroner sufficiently stated the cause of death in a way that would establish the *corpus delicti* of the charge. The expert did not challenge the toxicology report showing the lethal level of cyanide in decedent's body, and could not conclusively state how the unnatural accumulation of cyanide would have entered decedent's body. Moreover, the coroner testified on rebuttal that she had reviewed six prior cyanide poisoning deaths and those cases did not uniformly exhibit the classic signs of cyanide poisoning either.

Viewing this evidence in a light most favorable to the state, we find that the state presented sufficient evidence in the form of the coroner's opinion to show that decedent died from intentional cyanide poisoning. The fifth assignment of error is overruled.

## VI

The sixth assignment of error and defendant's *pro se* assignment "B" complain that the evidence failed to prove the manner of death, that is, how defendant would have poisoned decedent.

Defendant argues that the autopsy suggested that decedent either ingested the cyanide through a meal of pasta salad or drank it through some liquid. He maintains his absence from the county at the time of death casts doubt on his ability to put the poison in decedent's food or drink. Moreover, he claims that unrebutted testimony showed that his family members ate from the same bowl of pasta salad and suffered no ill effects.

It is true that the state did not present any direct evidence to show how defendant placed the poison, but the circumstantial evidence was sufficient to establish that defendant not only possessed the cyanide, but that he might have known how cyanide reacts in the body.

Defendant's past experience with the Lorain County Coroner's Office might have given him the opportunity to learn about cyanide poisoning. This point was demonstrated by his familiarity with cyanide's chemical abbreviation, a fact not ordinarily known by most persons. More important, defendant clearly knew about autopsy techniques employed in poisoning cases, as indicated by his insistence that decedent be transported to local hospital where an autopsy might not be as thorough as that performed by the coroner.

While cyanide is often described as having the odor of burnt almonds, a significant portion of the population cannot smell cyanide at all, so it is possible that decedent would not be aware that it had been placed in the food. The

evidence also showed that cyanide does not lose its potency when mixed with food. With this knowledge, defendant could have placed the cyanide in previously prepared food that he knew decedent might eat during his absence from the county. Certainly, a large bowl of pasta salad might be the ideal medium for the poison, since it would not spoil if kept in the refrigerator for several days. Defendant might also have known that the dose of cyanide found in decedent's body would cause death within about twenty minutes. This might make a death look accidental or like a suicide.

To be sure, defendant's witnesses testified that they ate from the same pasta salad, but the jury obviously rejected this testimony. Defendant's sister-in-law testified that she ate the pasta salad shortly before decedent's funeral, but admitted that she only ate "a piece." The jury might have found this testimony doubtful or, assuming that it believed the testimony, could have reasonably concluded that one piece of pasta salad might not contain enough poison to have an adverse effect on the sister-in-law. This circumstantial evidence, if believed, would serve to establish the manner of death. The sixth assignment of error is overruled.

## VII

The seventh assignment of error complains that the verdict is against the weight of the evidence. Defendant argues that questions concerning the cause and manner and death are so pronounced as to cast doubt on the jury's verdict.

The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The substance of this claim has been addressed in the previous assignments of error and we see no need to restate our findings. The jury obviously resolved questions of credibility against defendant, and nothing in the record suggests any error in the resolution of those questions. The seventh assignment of error is overruled.

## VIII

In his eighth assignment of error, defendant complains that the trial court erred by denying his motion for a new trial. His argument is twofold: (1) the trial should have issued findings of fact and conclusions of law and (2) the substitute judge hearing the motion for a new trial should not have ruled on the motion without first obtaining a transcript of the trial.

As grounds for the new trial motion, defendant cited prosecutorial misconduct under Crim.R. 33(A)(2). He complained that the state knowingly withheld

photographs of test tubes that may have cast doubt on the validity of the coroner's testing procedure.

At trial, the defense sought to discredit the coroner's testing procedures, arguing that cyanide could develop in stored body fluids if certain safeguards were not in place. The state presented testimony that the coroner's office used sodium fluoride as an inhibitor in test tubes containing decedent's body fluids. During rebuttal testimony by the coroner, the transcript shows that the parties approached the side bar. An off the record discussion ensued and the trial judge stated, "[o]bjection to what's marked as 46 and 47 is sustained."

In his motion for a new trial, defendant claimed that those exhibits were photographs from the coroner's office that showed test tubes partially filled with a colored liquid. He argued that these photographs should have been turned over to the defense pursuant to a discovery request and might have contained exculpatory evidence relating to the testing procedure.

## A

Defendant's first argument under this assignment of error is that the trial court should have issued findings of fact and conclusions of law when ruling on the motion for a new trial. Crim.R. 33 is silent on the issue whether the trial court must issue findings of fact and conclusions of law when denying a motion for a new trial, so we may look to the comparable Rule of Civil Procedure. See Crim.R. 57(B).

Civ.R. 59(A) governs new trial motions in civil cases and states that when a new trial is granted, the court shall specify in writing the grounds upon which a new trial is granted. See *Antal v. Olde Worlde Products, Inc.* (1984), 9 Ohio St.3d 144, 9 OBR 392, 459 N.E.2d 223, syllabus. This requirement applies only if the trial court grants the motion for a new trial—the rule does not create a corresponding duty to issue findings of fact and conclusions of law in the event the trial court denies the motion for a new trial. See *Schneider v. First Natl. Supermarkets* (Dec. 5, 1996), Cuyahoga App. No. 70226, unreported, at 3, 1996 WL 695631. Because the court denied the motion for a new trial, it had no duty to issue findings of fact and conclusions of law.

## B

Defendant's second argument is that the substitute judge hearing the new trial motion should not have ruled on the motion for a new trial without first reading a transcript of the trial. Civ.R. 63(B) addresses the disability of a judge and states that a judge may be designated to perform the duties of a trial judge who is unable to perform duties after a verdict has been rendered. A judge so

designated is not *per se* required to grant a new trial when faced with a motion for a new trial that questions the weight or credibility of the evidence. See *Elsnau v. Weigel* (1983), 5 Ohio St.3d 77, 79–80, 5 OBR 131, 132–133, 448 N.E.2d 1377, 1378–1379.

Defendant's motion for a new trial presented a rather straightforward issue relating to an alleged discovery violation. It did not involve in any way matters that were addressed at trial, so there would have been no need for the designated judge to refer to portions of the transcript. Bluntly put, the motion for a new trial lacked serious substantive grounds and we find that the designated trial judge did not err by ruling on the motion for new trial without first reading a transcript of the entire trial. The eighth assignment of error is overruled.

## IX

The ninth assignment of error complains that the trial court erred by giving the jury the reasonable doubt instruction found in R.C. 2901.05(D). He argues that the trial court should have used the instruction outlined in *Cage v. Louisiana* (1990), 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339, which rejects the use of the words "moral certainty" in defining to jurors the definition of reasonable doubt. We overrule this assignment on authority of *State v. Frazier* (1995), 73 Ohio St.3d 323, 330, 652 N.E.2d 1000, 1008, in which the Supreme Court stated:

"Accordingly, we maintain our position and hold that the definition of reasonable doubt provided in R.C. 2901.05(D) accurately imparts the concept of reasonable doubt and does not diminish the state's requirement to prove guilt beyond a reasonable doubt." See, also, *State v. Jenkins* (1984), 15 Ohio St.3d 164, 210, 15 OBR 311, 350–351, 473 N.E.2d 264, 304–305.

## X

In his tenth assignment of error and *pro se* assignment "C," defendant complains that he was denied a fair trial as a result of the state making several improper comments on his exercise of his right to remain silent at trial.

The state may not comment on an accused's failure to testify at trial. *Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. However, the state may comment that evidence against an accused is uncontradicted and unrefuted. *State v. Lockett* (1976), 49 Ohio St.2d 48, 65, 3 O.O.3d 27, 37, 358 N.E.2d 1062, 1073–1074. The distinction is "whether the language used was *manifestly* intended or was of such character that the jury would naturally and *necessarily* take it to be a comment on the failure of the accused to testify."

(Emphasis *sic.*) *State v. Webb* (1994), 70 Ohio St.3d 325, 328–329, 638 N.E.2d 1023, 1028, citing *Knowles v. United States* (C.A.10, 1955), 224 F.2d 168, 170.

██ Defendant did not object to any of these comments, so we proceed under a plain-error analysis. *State v. Steinman* (1992), 79 Ohio App.3d 246, 251–252, 607 N.E.2d 67, 71–72. Plain error will not be recognized unless the outcome of the trial clearly would have been different but for the error. *State v. Long* (1998), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Nothing in the record suggests that, but for these comments, the verdict would clearly have been different. Accordingly, we find no plain error.

██ Even had defendant made timely objections, they would not have been well taken. The first alleged instance of prosecutorial misconduct occurred as the state summarized testimony of witnesses who recounted statements made by defendant. The state told the jury:

"Again, these are his words. And the words that you heard from these folks supplied by him are unrefuted, and they are uncontroverted. There has been no evidence offered to say that these people are incorrect. None at all."

The state qualified its first statement by noting that the witness testimony was "unrefuted" and "uncontradicted." These words mirror the language approved of in *Lockett, supra,* and did not constitute a comment by the prosecutor upon the failure of defendant to testify. *Id.,* 49 Ohio St.2d at 65, 3 O.O.3d at 37, 358 N.E.2d at 1073–1074.

The second alleged instance of prosecutorial misconduct occurred as the state noted that defendant did not tell the police he obtained a quantity of cyanide:

"You know, with respect to the source, the defendant had no less than three occasions to tell the police that he had ordered the cyanide. There was the initial search that wasn't with the search warrant. There was the search with the search warrant that came later. I think it was October 18th or 19th. You'll remember the date if I'm incorrect on that. And then finally there was the time of the statement. And not one time did the defendant say oh, I should tell you this. I had ordered a quantity of potassium cyanide. He did not tell the police that despite having at least three occasions and two of those being when he knew the police were looking for poisons and cyanide."

██ The second alleged instance of misconduct related to defendant's refusal to cooperate during the police investigation of decedent's death, not his failure to testify at trial. The state simply noted that defendant knew the police were searching for poisons of any kind, including cyanide, and that he did not inform the police that had obtained two grams of cyanide. We find this statement an accurate summation of the evidence.

The final alleged instance of misconduct occurred as the state discussed how the defendant might have placed the cyanide in decedent's food or drink:

"Ladies and gentlemen, we don't have to tell you how it was introduced into her system. We know that it was ingested. And there is only one person that can tell you how it was introduced, and that's the defendant."

The third alleged instance of misconduct presents a closer question. The state told the jury that defendant was the only person who could tell them how the poison was introduced. The issue is whether (1) the state manifestly intended the statement to be a comment on defendant's failure to testify or (2) whether the jury would necessarily take this statement to be a comment on defendant's failure to testify. *Webb, supra*, 70 Ohio St.3d 325, 638 N.E.2d 1023.

The state's comment was not "manifestly intended" to be a comment on defendant's failure to testify, nor would the jury "naturally and necessarily" take it to be a comment on defendant's testimony. Importantly, the state made the contested comment as a response to defendant's own closing argument in which he maintained that the state did not prove how defendant would have had the opportunity to introduce the poison into decedent's food. Viewed in this context, we find that the jury would naturally and necessarily have taken the remark as a comment on the evidence, not defendant's refusal to testify. The tenth assignment of error is overruled.

## XI

The eleventh assignment of error and *pro se* assignment "D" argue that the trial court improperly denied defendant's motion for a mistrial based upon the admission of prejudicial hearsay.

A funeral home employee testified and related a discussion he had had with another funeral employee:

"As I recall, she said that they were going through this scenario of ways this could have been accomplished, this death. And she didn't tell me what scenario was put forward, but she did say that [defendant] said to her, 'That's not the way I did it.' "

The parties went to side bar where defendant objected to the statement and asked the court to strike it and issue a curative instruction. The court agreed over the objection of the state. Defendant then asked the court to declare a mistrial, claiming that a curative instruction would not be sufficient. The court denied the motion for a mistrial and gave the jury the following instruction:

"Ladies and gentlemen, the last response of the witness has been objected to and there was a move to strike the statement of the witness as to what his

recollection of the conversation that Kathy Latimer related to him about a conversation with the defendant. She testified earlier. You will recall that's the individual who testified earlier. That objection is sustained. The response of this witness is stricken.

"You are to treat it as if you never heard it and disregard it. You will rely upon the testimony to the extent that you deem proper, to the extent that you accept credibility or reject credibility of the witness who actually made this statement. Okay? So the comment of this witness in response to the question about a conversation with Mr. Girts and Miss Latimer, his response is to be stricken. It's not to be used by you for any purposes."

We easily reject defendant's argument that this curative instruction could not cure the witness's statement. A jury is presumed to follow curative instructions. *State v. Loza* (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082, 1100. The curative instruction given by the trial judge was more than complete, and nothing in the record suggests that the jurors disregarded that instruction. The eleventh assignment of error is overruled.

## XII

In defendant's *pro se* assignment "F," he argues that the cumulative effect of all the errors denied him a fair trial. Having found either that there were no errors or that the errors were not prejudicial, we summarily overrule this assignment.

*Judgment affirmed.*

JAMES D. SWEENEY, C.J., and ROCCO, J., concur.