JOURNAL ENTRY AND OPINION
In appellate case number 75711, defendant-appellant Quamaine Brooks appeals from his conviction for one count of felonious assault in violation of R.C. 2903.11 and for one count of child endangering in violation of R.C. 2919.22. In appellate case number 75712, defendant-appellant Geraldine Brooks appeals from her conviction for one count of child endangering in violation of R.C. 2919.22. The two appeals have been consolidated for purposes of briefing and disposition.
Appellants assign the following errors for review:
 I. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY PERMITTING THE JURY TO CONTINUE DELIBERATIONS WITH ONLY ELEVEN JURORS WHEN ONE JUROR IS EITHER UNABLE OR UNWILLING TO PERFORM HIS DUTY, THEREBY VIOLATING THE DEFENDANTS' RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
 II. THE DEFENDANTS WERE DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I, SECTION TEN OF THE OHIO CONSTITUTION, BECAUSE TRIAL COUNSEL WAIVED THE REQUIREMENT OF TWELVE JURORS ON BEHALF OF HIS CLIENTS AND NO VOLUNTARY, INTELLIGENT, AND KNOWING WAIVER WAS OBTAINED IN WRITING.
 III. BOTH DEFENDANTS' CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND SHOULD BE REVERSED.
Finding the appeals to lack merit, the judgment of the trial court is affirmed.
 I.
On March 7, 1998, Donald Stratford brought his three-month old daughter Angelique to Fairview Hospital. The infant had an elevated temperature, questionable mental status, lethargy, and twitching in her lower extremities. The emergency room physician noted that Angelique had bulging fontanelles, abrasions on her left cheek and abdomen, and a blank stare. After discovering blood in her spinal fluid, a CAT scan of the child's head was ordered. Fairview Hospital contacted Rainbow Babies and Children's Hospital, a level one trauma center, and the decision was made to transfer the infant to that facility.
The baby arrived at Rainbow Babies and Children's Hospital in a coma with a breathing tube inserted. Angelique Stratford was diagnosed with significant trauma, most of which was centered on the brain. The CAT scan showed skull fractures above each ear and edema or swelling within Angelique's brain. There were several areas of bleeding within the brain. Fluid was noted on the outside of her brain. Fluid will fill the space between the skull and brain after shrinkage caused by death of brain tissue. Angelique's brain eventually shrank to the size of a walnut. The bone sutures in her skull were split apart. The cranial pressure measured at four times the normal amount. Strokes occurred on both sides of the brain. The doctors discovered evidence of hemorrhages in the retinas. The baby suffered significant neurological damage to both sides of her brain. The damage must have been inflicted upon the infant as least twenty-four hours before the CAT scan was taken at Fairview Hospital at 7:53 p.m. on March 7, 1998.
The physicians who examined Angelique agreed that the cause of her injuries was inflicted trauma, most likely the result of having been severely shaken. It was their opinion that a significant amount of force would be required to cause the amount of edema and injury suffered by Angelique. The injuries could not have been caused by a fall from a couch, by striking a coffee table, or by riding in a car. The pattern of trauma demonstrated in Angelique's case did not fit the pattern of minor head injury common for children in this age group. Instead, the sort of major injury to the head suffered by Angelique might be seen if the child was involved in a major motor vehicle accident in a car traveling in excess of fifty miles per hour or if the baby fell out of a tenth floor window. However, the most likely cause remained inflicted trauma entailing significant shaking by a person strong enough to disrupt the blood vessels in the brain. It is unlikely that an eight-year old child would be capable of causing this severe an injury to Angelique.
Once a child sustains this kind of injury, the level of consciousness becomes clouded. The child would not eat normally and might vomit. The child becomes progressively sleepier until falling into a coma. Seizures or epilepsy can occur. Most likely, the child's condition would rapidly deteriorate although the symptoms might develop over a period of time. Because Angelique's injuries were massive, it would be expected that some of the symptoms would have manifested themselves immediately after the injury occurred.
The Cleveland police were called to investigate the assault case. The police detectives learned Angelique had been in the care of her maternal grandmother, appellant Geraldine Brooks, for the two weeks preceding March 7, 1998. Geraldine Brooks told the detectives that Angelique had been at her home for two weeks but that the baby had been fine the entire time. Geraldine Brooks had no knowledge of how Angelique came to be injured but stated it did not happen at the Brooks' home.
Other members of the Brooks family were living in the house during the time Angelique stayed there. Those family members were Geraldine Brooks' mother, Minnie, Geraldine's sister Elaine, Elaine's son Michael, and Geraldine's twenty-year old son Quamaine. Geraldine's oldest son resided in the upstairs portion of the duplex with Wadell Jefferson and their three children.
Geraldine Brooks maintained that the only injury she noticed on Angelique were some scratches on the child's abdomen. Geraldine Brooks surmised that the scratches were caused by the zipper on one of the couch cushions. The Brooks family offered various explanations as to how the infant may have been injured, ranging from a fall from the couch in which she hit her head on the coffee table to being hit by eight-year old Michael. None of the scenarios offered by any of the Brooks family could have resulted in the severe injuries sustained by the baby.
The police questioned Quamaine Brooks. He denied any involvement, stating he never was home because of attending school and work. Quamaine Brooks told the police he went to school every day for the week of March 2 through March 6, 1998, and worked at Burger King each day except for Thursday. Attendance records from the Cleveland Public Schools established that Quamaine Brooks had unexcused absences for March 4 and March 6, 1998. Quamaine Brooks did not work on March 4, 5, or 6, 1998.
Geraldine Brooks gave an oral statement to the police. Geraldine Brooks maintained that the only injuries she observed on Angelique were some scratches on the child's abdomen. Geraldine Brooks took Angelique to the child's father, Donald Stratford, on March 7, 1998. Stratford asked what was wrong with the baby because Angelique's eyes were glassy and she appeared to be having difficulty breathing. Geraldine Brooks told Stratford the baby had been fine at her house and left to shop.
Donald Stratford agreed that Geraldine Brooks brought Angelique to his home on March 7, 1998, between 11:30 a.m. and 12:30 p.m. Geraldine Brooks provided child care because both parents worked the same shift and did not have their own automobile. Angelique had been with Geraldine Brooks since February 22, 1998, and Stratford had not expected the child to be returned on March 7, 1998. Geraldine Brooks telephoned that morning to inform Stratford that she planned on shopping near his home and would bring the baby. Stratford noticed that the infant seemed sleepy. While undressing Angelique, Stratford saw the scratches on her abdomen and asked Geraldine Brooks about the injury. Brooks stated that the zipper from a couch cushion caused the scratches and that it happened while her daughter Billie Jo was with Angelique. Billie Jo Isom is the mother of Angelique.
After Geraldine Brooks left, Stratford began to notice differences in Angelique's behavior. The child was not responsive and had difficulty eating. Stratford attempted to contact Geraldine Brooks to find out if anything happened to the baby but was unsuccessful until sometime between 3:30 and 4:30 p.m. Brooks again denied anything happened and said Angelique had been fine. Victoria Mayfield, Stratford's grandmother, was present and observed the changes in the baby's behavior. Angelique did not cry, had a fixed stare, and her legs were twitching. Mayfield told her grandson to take Angelique to the hospital.
Shortly before 6:00 p.m., Stratford called for a cab to take Angelique to the hospital. While awaiting its arrival, Stratford took some photographs of Angelique in order to document her condition. Billie Jo Isom joined Stratford at the hospital. Geraldine Brooks arrived right before Angelique was taken to Rainbow Babies and Children's Hospital. Geraldine Brooks told Stratford and Isom that eight-year old Michael might have dropped or hit the baby.
The police arrested Geraldine, Quamaine, and Elaine Brooks for child endangering. The police later dropped the charge against Elaine Brooks. The grand jury indicted Quamaine Brooks on charges of attempted murder, felonious assault, and child endangering. Geraldine Brooks was indicted for one count of child endangering. The state dismissed the attempted murder charge prior to the commencement of trial.
At trial, Geraldine Brooks testified that she never noticed anything wrong with Angelique prior to taking the child to Stratford. Geraldine Brooks averred that on Friday, March 6, 1998, Angelique was active and acting normally. Geraldine Brooks did not observe any differences in Angelique the following morning either. Geraldine Brooks agreed that Angelique was not injured accidentally but that someone intentionally inflicted the injuries on the infant.
Quamaine Brooks testified that he did not see Angelique the entire week before March 7, 1998. Brooks averred that he spent the morning of March 6, 1998, with his brother Rasheed and the rest of the day and night shopping and attending a movie. Quamaine claimed he first learned of Angelique's condition when the police arrived on Sunday, March 8, 1998.
Nine-year old Michael Brooks testified that he lived in the same house as Geraldine and Quamaine Brooks during the first week of March in 1998. Cuyahoga County placed Michael in foster care soon after Angelique was injured. Michael eventually identified both defendants in court, apparently after some efforts to intimidate the child at trial. Michael testified that he observed Quamaine Brooks punch Angelique in the back, stomach, and side. Michael also saw Quamaine grasp the baby by the leg so she hung upside down before being dropped to the floor. Michael stated these events occurred on different days.
The jury began deliberations on Thursday, October 29, 1998. The jury sent a number of communications to the trial judge while deliberating. On Wednesday, November 4, 1998, one juror failed to appear for service because of the death of a parent. The following exchange took place in open court:
 THE COURT: Mr. Jordan, have you discussed this situation with your clients?
 MR. JORDAN: I have discussed the situation with my clients, your Honor. It's our position to let the 11 continue with their deliberations.
 THE COURT: And then your clients are waiving the absence of the twelfth juror?
MR. JORDAN: Yes, they are.
 THE COURT: They are waiving all their rights to have a jury of 12 decide the guilt or innocence in these particular charges?
MR. JORDAN: Yes, they are.
THE COURT: Okay. Please bring the jury in.
(Tr. 679-680)
The jury continued its deliberations with the remaining eleven jurors. That day, November 4, 1998, the jury found Quamaine Brooks guilty of felonious assault and child endangering but did not find "serious physical harm" on the child endangering count. The jury convicted Geraldine Brooks of child endangering and did find that serious physical harm resulted.
 II.
In their first assignment of error, appellants contend the trial court erred by permitting the jury to continue to deliberate after one juror did not return for jury duty. Appellants assert that they did not personally assent, orally or in writing, to the waiver of their right to a twelve person panel. Appellants argue that, without an affirmative waiver of a jury of twelve, their convictions should be reversed.
The record reflects that defense counsel was given time to discuss the situation with appellants. Both appellants were present in court when their attorney waived their right to be tried by a twelve member jury. Therefore, appellants agreed to proceed with eleven jurors and have waived any assertion of error. This court will review the assignment of error under the plain error standard. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52 (B). Notice of plain error is taken with the utmost caution, under exceptional circumstances, and only to prevent the manifest miscarriage of justice. State v. Landrum (1990), 53 Ohio St.3d 107, 111.
Crim.R. 23 (B) states that a twelve member jury be provided for felony cases. Although a trial court has a legal duty to comply with the dictates of Crim.R. 23 (B), the rule is not absolute. See State v. Thomas (1980), 61 Ohio St.2d 223. The United States Supreme Court has held that a twelve person jury is not a necessary ingredient to a defendant's right to trial by jury. The use of a twelve member jury is the result of a historical accident and not an indispensable component of theSixth Amendment right to a trial by jury. Williams v. Florida (1970),399 U.S. 78. A particular number of jurors is not required for a jury to fulfill its role of providing an interposition of the commonsense judgment of an accused's peers between the defendant and the state. Id. at 100. A criminal defendant may waive constitutional and statutory trial rights. State v. Girts (1997),121 Ohio App.3d 539. The number of jurors permitted at felony and misdemeanor trials is not absolute as it is a matter of procedure and not a substantive right. Id.
In State ex rel. Warner v. Baer (1921), 103 Ohio St. 585, the Supreme Court of Ohio held that a defendant "may, with the approval of the trial court, consent to be tried by a jury composed of less than twelve men." Id. at paragraph two of the syllabus. A trial court may not try a person with less than twelve persons under the Ohio Constitution. However, the defendant may waive this right and, if he does so, cannot raise the issue on appeal. Id. at paragraph three of the syllabus. The court in Easler v. State (1927), 25 Ohio App. 273, relied upon Baer in upholding the conviction of two defendants for grand larceny. The defendants agreed to be tried by eleven jurors. The court held that a defendant may waive, or their counsel may waive in the defendant's presence, trial by a twelve person jury.
A more recent example occurred in State v. Capan (April 19, 1995), Summit App. No. 16892, unreported, in which the trial court dismissed a juror immediately before jury instructions were given. Because no alternate jurors were available, the remaining eleven jurors deliberated. The defendant offered no objection to the eleven member jury at the trial court level but asserted plain error on appeal. The Ninth District Court of Appeals noted that defense counsel affirmatively agreed to the diminished jury. The court, citing to Baer, stated that a defendant has the ability to waive his right to a full twelve person jury. The court held that plain error was not present because the defendant agreed to the eleven member jury.
In the instant case, defense counsel discussed the matter with both appellants and informed the trial court that appellants wished to proceed with the remaining eleven members of the jury. Although it may have been the better practice for the trial court to directly ask the defendants if they agreed to proceeding with the diminished jury, the oral waiver by defense counsel on the record and in the presence of appellants is sufficient. Appellants waived their right to have their case determined by a twelve member jury. There is no indication in the record that the result of the trial was a manifest miscarriage of justice requiring the imposition of the plain error doctrine.
Appellants' first assignment of error is overruled.
 III.
In their second assignment of error, appellants assert their counsel was ineffective for agreeing to proceed with the eleven member jury. Appellants point out that, before the one juror failed to return for deliberations, the jury apparently was having difficulty reaching a consensus. The trial court received numerous communications from the jury requesting definitions or clarifications of the terms "knowingly," "circumstantial evidence," "reasonable doubt," and "in loco parentis." The jury deadlocked on the charge of child endangering against Quamaine Brooks. Later, the jury reported that it had arrived at a verdict on the charges of felonious assault and child endangering regarding Quamaine Brooks but that there was a change in the verdict on the count of child endangering against Geraldine Brooks. One juror did not agree with the concept of "in loco parentis." All of these communications occurred prior to the dismissal of the twelfth juror.
The eleven member jury sent two further communications to the trial court. In one, the jury asked if the trial court could reevaluate a juror's willingness to serve. The second communication stated that the jury was hopelessly deadlocked. The jury then arrived at its verdict.
Appellants argue that defense counsel's decision to proceed with the diminished jury created a risk that the jury would reach an unjust result. Appellants contend that their right to a full deliberative body was sacrificed for the sake of expediency.
To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defense. Strickland v. Washington (1984), 466 U.S. 668, 687. A properly licensed attorney is presumed to execute his duties in an ethical and competent manner. State v. Smith (1987), 36 Ohio App.3d 162. Ineffectiveness is demonstrated by showing that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. Statev. Hamblin (1988), 37 Ohio St.3d 153. To establish prejudice, a defendant must show that there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. Strickland, supra. at 694.
In Girts, supra, the trial court permitted two alternates to remain in the jury room during deliberations. On appeal, Girts complained that his attorney's failure to object to the presence of the alternate jurors denied Girts effective assistance of counsel. This court stated that if the attorney was satisfied with the composition of the jury but concerned that a juror might have to be excused during deliberations, then the desire to keep the jury together would fall within the realm of trial strategy. Further, even if the attorney's performance was deficient, this court found no probability that, but for the error, the result of the trial would have been different. The court in Baer, supra, when considering a similar situation as occurred in the instant case, stated:
 It is not claimed in this case that the state gained any advantage by proceeding with only eleven jurors, except the proper advantage of saving time and expense; neither is it claimed that any disadvantage resulted to the accused, except the possibility that the juror who was excused might have caused a disagreement. This remote possibility takes us into the realm of conjecture, and if we are to indulge in conjecture it may be conjectured that the defendant and his counsel believed it to be to their advantage to go on with eleven jurors. The excused juror might have been objectionable; the defense may have been well prepared, with witnesses assembled who could not be assembled at a later date; the defendant may have considered the expense which would accrue to himself from another trial. These and numerous other tactical advantages, known perhaps only to himself and counsel, might make it very important to him to proceed with the trial. To declare as a principle of law that he may not waive his constitutional privileges, and to compel him to forfeit any tactical advantages, would defeat the purposes which the constitutional provisions were designed to serve.
Id. at 611-612.
Prior to the dismissal of the juror, the jury sent a number of communications to the trial court which appeared to indicate the jury was having difficulty reaching a determination regarding the guilt of appellants for the offenses charged. It may be, to indulge in some conjecture, that defense counsel and appellants felt there was a high probability for a defense verdict being reached with that particular jury. The record is clear that defense counsel consulted with appellants before agreeing to proceed with the eleven member jury. Appellants and their attorney may have felt it was to their advantage to continue the trial instead of risking a new trial. That decision is one of trial strategy which a reviewing court ordinarily will not second-guess on appeal.
Also, appellants have not demonstrated any prejudice. After the dismissal of the juror, the jury still deadlocked for a time before reaching a verdict. Appellants cannot show that there was a reasonable possibility that, but for the decision to allow the diminished jury to continue deliberating, appellants would have been acquitted.
Appellants' second assignment of error lacks merit.
 IV.
Appellants' third assignment of error challenges the weight of the evidence admitted at trial in support of their convictions. Appellants assert that little, if any, of the evidence adduced at trial supports a finding of guilt beyond a reasonable doubt for the offenses charged.
To determine whether a conviction is against the manifest weight of the evidence:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
Thompkins, supra, at 387, citing State v. Martin (1983), 20 Ohio App.3d 172,175.
Quamaine Brooks asserts that the only person who allegedly witnessed Quamaine abusing Angelique was his eight-year old cousin, Michael. Michael testified Quamaine struck Angelique in the stomach and back. The medical testimony admitted at trial indicated that Angelique's injuries resulted from being severely shaken and not from being hit or dropped. Quamaine Brooks argues that no direct evidence was admitted at trial showing that he caused the injuries to Angelique.
Quamaine Brooks was convicted of felonious assault in violation of R.C. 2903.11, which proscribes a person from causing or attempting to cause serious physical harm to another. "Serious physical harm" includes any physical harm that carries a substantial risk of death or which involves some permanent incapacity or physical harm involving substantial suffering. R.C.2901.01 (A) (5).
There is no argument that Angelique suffered serious physical harm. Quamaine Brooks disputes that he caused the harm to Angelique. The record reflects that Quamaine Brooks lied to the police about his attendance at work and school. The prevarications apparently were used to support Quamaine Brooks' contention that he could not have been responsible for the infant's injuries because he was never in the home. Quamaine Brooks even testified he did not know the child had been injured until Sunday night, one day after she was taken to the hospital. He stated that the police who arrived at the house on Saturday never said they were there to investigate anything with regard to the baby. Quamaine Brooks also stated that his mother did not mention that Angelique was hurt.
The record is clear that, with the exception of eight-year old Michael, the entire Brooks family neither saw nor heard anything that could have caused the severe injuries suffered by three-month old Angelique while she stayed in their home. Geraldine Brooks and Wadell Jefferson claimed the baby acted normally past a point where it would have been likely from a medical standpoint. Instead, the emphasis seemed to be to blame an eight-year old child, whom the medical experts agreed would not have had the strength to inflict the massive injuries on the baby.
The state presented evidence that Quamaine Brooks changed his story regarding his whereabouts on Friday, March 6, 1998. He possessed the strength to injure the child. Further, Quamaine Brooks claimed to have been unaware of Angelique's condition until the day after she was taken to the hospital. His mother went to the hospital the day before to see the baby and the police were at the Brooks' home on March 7, 1998. The jury certainly would have been justified in discounting Quamaine Brooks' testimony as being incredible. The jury's verdict of guilty on the charge of felonious assault did not result in a manifest miscarriage of justice.
The jury also convicted Quamaine Brooks of child endangering in violation of R.C. 2919.22 (B) (2), which forbids a person from torturing or cruelly abusing a child. The testimony of Michael showed that he observed Quamaine Brooks strike Angelique on more than one occasion. Michael Brooks saw his cousin Quamaine hit Angelique more than once and drop the infant onto the floor. The abuse Michael witnessed would not have caused the injury to Angelique's brain but would be evidence of cruel abuse of an infant. There also was evidence the baby had been scratched. The pattern of the scratches was not consistent with an accidental scratching caused by the zipper of a couch cushion. This evidence does not reflect that serious physical harm was inflicted upon Angelique for those instances but is evidence she was severely abused.
Quamaine Brooks contends that there is an inconsistency between his conviction for felonious assault, R.C. 2903.11, which proscribes knowingly causing "serious physical harm to another," and the jury's additional finding that his conduct did not result in serious physical injury to enhance, under R.C. 2919.22 (E), his conviction for child endangerment, R.C. 2919.22 (B). In Statev. Lovejoy (1997), 79 Ohio St.3d 440, the first syllabus reads:
 The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count. (Browning v. State [1929], 120 Ohio St. 62; State v. Adams [1978], 53 Ohio St.2d 223, paragraph two of the syllabus, vacated on other grounds [1978], 439 U.S. 811; State v. Brown [1984], 12 Ohio St.3d 147; and State v. Hicks [1989], 43 Ohio St.3d 72, approved and followed.)
Because any inconsistency here was not in response to the same count but arose out of different counts, it does not undermine the correctness of the jury's verdict.
Geraldine Brooks argues that her conviction for child endangerment was against the manifest weight of the evidence. Geraldine Brooks contends there is no evidence she created a substantial risk of serious physical harm to her granddaughter. Geraldine Brooks maintains she could not have known the child was being abused or prevented the abuse from taking place.
R.C. 2919.22 (A) provides in pertinent part:
 No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.
R.C. 2919.22 (A) applies not only to parents and guardians, but to anyone having temporary control of a child. See State v. Johnson (Sept. 24, 1997), Lorain App. No. 96CA006506, unreported. This statute is concerned with neglect, which is generally characterized by acts of omission. State v. Kamel (1984), 12 Ohio St.3d 306,308. The term "substantial risk" is defined by R.C.2901.01 (A) (8) as meaning "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." The defendant must violate a duty of care, protection, or support, thereby creating a substantial risk to the health and safety of the child. A parent, guardian, or person in loco parentis must protect the child from abuse and provide care for the child's injuries. See State v. Saramons (1979), 58 Ohio St.2d 460.
The culpable mental state is one of recklessness. State v.McGee (1997), 79 Ohio St.3d 193.
 A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
R.C. 2901.22 (C).
Medical testimony admitted at trial showed that Angelique most likely would have began exhibiting symptoms soon after being injured. She probably would have had symptoms of an altered state of consciousness, difficulty eating, vomiting and seizures and would have seemed listless and sleepy. It is known that Angelique displayed symptoms of sleepiness, twitching, unresponsiveness, and difficulty eating at the time Geraldine Brooks took the baby to Donald Stratford. Upon being questioned, Brooks insisted the baby was fine during the drive over to the Stratford home. Brooks brought the baby to Stratford after apparently making a sudden decision to shop on the other side of town. The jury certainly could infer that Brooks knew something was wrong with Angelique but, instead of seeking medical attention, decided to take the baby to someone else. This behavior was reckless because the failure to provide prompt medical attention exacerbated the severity of the injuries as the child's brain continued to swell. Further, the unbelievable series of explanations offered by Geraldine Brooks in response to inquiries regarding how the injuries occurred undercut any notion that Geraldine Brooks did not realize the baby was badly hurt but showed that she chose to attempt to cover-up the crime instead of aiding her granddaughter.
Geraldine Brooks' conviction for child endangerment was not against the manifest weight of the evidence.
Appellants' third assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellants its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DIANE KARPINSKI, P.J. and JAMES D. SWEENEY, J. CONCUR.
 ___________________________ LEO M. SPELLACY, JUDGE