JOURNAL ENTRY AND OPINION
{¶ 1} Defendant Jason Betts appeals from his conviction for aggravated murder alleging felony murder, two counts of aggravated robbery, and firearm specifications. For the reasons set forth below, we affirm.
 {¶ 2} On May 14, 2004, defendant was indicted for two counts of aggravated murder with felony murder and three-year firearm specification, and two counts of aggravated robbery with one and three-year firearm specifications, in connection with the shooting death of David Reyes. Defendant pled not guilty and the matter proceeded to a jury trial on September 14, 2005. In his opening statement, the prosecuting attorney told the jury that the state's evidence would show that defendant's girlfriend, Jessica Randleman, made an oral statement to police in which she indicated that defendant got rid of a gun during a pursuit for breaking and entering and that he hoped that the gun was not recovered "because it could tie him to a lot of stuff." (Tr. 1213-1214). Defense counsel moved for a mistrial, citing this statement and the prosecuting attorney's failure to disclose it prior to trial. At the hearing on this issue, Randleman denied making the oral statement and testified that she told the prosecuting attorney that the statement was not true. The trial court denied the motion for a mistrial.
 {¶ 3} Defense counsel also moved for a mistrial after all of the evidence had been presented, and complained that in his opening statement, the prosecuting attorney informed the jury that Norman Pomales would testify, but Pomales was *Page 4 
never called as a witness. (Tr. 2503). The trial court denied this second motion for a mistrial and the matter was submitted to the jury for deliberations. The jury was ultimately unable to reach a verdict and was discharged.
 {¶ 4} A second trial to a death-qualified jury commenced on June 12, 2006. The state's evidence demonstrated that in the weeks preceding his death, the decedent drove a gold Buick Riviera with distinctive specialty "20 inch Polo" rims. At this time, he was also helping his friend Jeffrey Williams remodel Williams' mother's house.
 {¶ 5} On October 8, 2002, Reyes left his vehicle on Cantor Avenue and went with Williams to meet friends at a bar. Later that night, Reyes was driven back to his car. Trisha Smith and Tina Maynard spoke to Reyes. After a few minutes, Tina observed someone walking in a nearby alley. Reyes said, "Oh shit," and fled. The individual chased Reyes. Reyes slipped and fell and the other man caught Reyes by the back of the shirt, took out a gun and shot Reyes, killing him. Maynard then observed a man drive away in Reyes' car.
 {¶ 6} Smith described the assailant as a dark complexioned African-American male, approximately 5'6" or 5'5", with dread locks or braids. Police recovered a 9 mm shell casing from the scene. A few hours later, police recovered Reyes' car while responded to a call that an automobile was being stripped on Parkview Avenue. The vehicle was missing both passenger side tires and the wheels on the driver's side appeared to be replacement wheels. The distinctive Polo rims had *Page 5 
been removed. Police obtained fingerprints from the right front fender, three exterior windows and a CD case inside the car.
 {¶ 7} Smith believed that she saw the man again at Reyes' wake. In the ensuing weeks, she looked at approximately twenty photographs for police but could not identify the assailant.
 {¶ 8} On October 16, 2002, Jeffrey Williams received a telephone call from Norman Pomales. Following this phone call, Williams contacted investigators and investigators in turn identified a green Pontiac automobile owned by Randleman.
 {¶ 9} By April 2003, police linked two of the fingerprints recovered from the right front fender of Reyes' car to defendant. The next month, Trisha Smith was shown a six-person photo array and indicated that defendant looked like the person but she could not be sure. Following a second photo array in April 2004, Smith identified defendant. That same month, Maynard identified defendant from a different six-person phot array but she stated that she could not be sure. At trial, Smith also identified defendant as the assailant.
 {¶ 10} In March 2003, Houston Foster turned over to police a 9 mm weapon he had found in the outdoor grill at his home located at 1371 East 185th Street. Police later determined that defendant had been arrest at 1371 East 185th Street in March 2003. In May 2004, police determined that a Browning 9 mm weapon found in the grill at Foster's home fired the 9 mm casing found at the crime scene and that a live round found within the Browning 9 mm was the same make and manufacture of the *Page 6 
casing found at the crime scene.
 {¶ 11} Police located defendant hiding in a closet at his parents' home. He denied ever seeing Reyes or Reyes' car. Defendant stated that Randleman is his girlfriend.
 {¶ 12} Defendant presented the testimony of Solomon Fulero, Ph.D. who testified that eye witness memories can be tainted by post-event information, that memories fade over time, that brief eye witness observations are less accurate than observations involving longer exposure times, and that various factors including the presence of weapons and other stressful factors tend to render eye witness observations less accurate. In addition, identifications of individuals from a different race tend to be less accurate as same-race identifications. Finally, Fulero opined that the presentation of a six-person photo array yields less reliable identifications than a sequential presentation of photos.
 {¶ 13} The defense also presented the testimony of Officer Edward Csoltko who arrested defendant at 1371 East 185th Street. According to Officer Csoltko, he reported to his dispatcher that the subject he was chasing was "possibly armed," and the report does not mention a gun but he believed that he did observe defendant to be armed during the pursuit. He conceded, however, that it was possible that a second individual involved in this incident could have been the person he observed with a weapon.
 {¶ 14} Defendant was subsequently convicted of the felony murder charge, *Page 7 
both aggravated robbery charges, and the firearm specifications. Following the penalty phase of the trial, defendant was sentenced to life imprisonment without the possibility of parole, plus a concurrent term of ten years for the aggravated robbery charges, and a single three-year term for the firearm specifications. Defendant now appeals and assigns twelve errors for our review.
 {¶ 15} For his first assignment of error, defendant asserts that the trial court erred in denying his motion for a mistrial made in the first trial, which challenged the prosecuting attorney's reference to Randleman's oral statement and Pomales' statement. Defendant further asserts that "[b]ecause of the severity of the prosecutorial misconduct which occurred during the first trial, the Double Jeopardy Clause bars his retrial" pursuant to Oregon v. Kennedy (1982), 456 U.S. 667,72 L.Ed. 416, 102 S.Ct. 2083, and he asks us to reverse and remand for a hearing as to this issue.
 {¶ 16} With regard to our standard of review, we note that the granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. State v. Trees, 90 Ohio St.3d 460, 2001-Ohio-4,739 N.E.2d 749; State v. Iacona, 2001-Ohio-1292,752 N.E.2d 937. The granting of a mistrial is only necessary when the ends of justice so require and a fair trial is no longer possible. State v. Franklin
(1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, citing Illinois v.Somerville (1973), 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425. *Page 8 
 {¶ 17} The denial of an evidentiary hearing is also reviewed for an evidentiary abuse of discretion. Cf. Abdus-Samad v. Bell (C.A. 6 2005),420 F.3d 614, 626.
 {¶ 18} In this instance we find no abuse of discretion. The prosecuting attorney's comments were made in opening statement and closing argument and the jury was instructed that these were not evidence. Further, in light of the actual evidence linking defendant to the home at 1371 East 185th Street and linking the murder weapon to this address, this court cannot say that the brief reference to Randleman's alleged statement rendered a fair trial impossible. Similarly, we cannot say that the brief reference to Pomales' out-of-court statement rendered a fair trial impossible.
 {¶ 19} Moreover, we note that the state did not dispute the essence of the defendant's claims and asserted instead, that it thought Randleman's statement could come in as a prior inconsistent statement and Pomales's statement could come in as nonhearsay offered not for the truth of the matter asserted but to explain subsequent conduct, we are unable to conclude that the trial court erred in failing to hold an evidentiary hearing.
 {¶ 20} As to whether plain error occurred in holding the second trial, we note that we conduct de novo review of a denial of a motion to dismiss an indictment on the grounds of double jeopardy. In re Ford (6th Cir. 1992), 987 F.2d 334, 339.
 {¶ 21} The Fifth Amendment to the U.S. Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." *Page 9 
 {¶ 22} In Oregon v. Kennedy, supra, the Supreme Court noted that the Double Jeopardy Clause affords a criminal defendant a valued right to have his trial completed by a particular tribunal, but does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding.
 {¶ 23} As an initial matter, this court notes that the first trial ended with a mistrial because the jury could not reach a verdict. Under R.C. 2945.36, this did not terminate the original jeopardy. AccordOregon v. Kennedy, supra, (noting that the Double Jeopardy Clause has been held not to bar a retrial where there is a "manifest necessity" for declaring a mistrial and that a "hung jury remains the prototypical example" of manifest necessity).
 {¶ 24} In some instances, prosecutorial misconduct may prevent a retrial. Typically mistrials for prosecutorial misconduct present possible double jeopardy implications where the defendant moves for a mistrial, the motion is granted and the double jeopardy implications of retrial must then be addressed. See, e.g., Oregon v. Kennedy, supra. Here, however, this matter presents the somewhat unusual backdrop of potential double jeopardy implications following the denial of the motion for mistrial and the case is then retried following a hung jury. This exact scenario was addressed in United States v. Gollamudi (Jan. 29, 1993), E.D.N.Y. No. CR-91-518.
 {¶ 25} The Gollamudi court considered the issue of the standard to be applied *Page 10 
where the request for a mistrial was denied, the matter was tried to a hung jury and a double jeopardy claim was then raised. The court considered the standard set forth in Oregon v. Kennedy, supra, i.e., that retrial is barred only if the prosecutorial misconduct was intended to subvert the double jeopardy protections, that is where the government intended to "goad" the defendant into moving for a mistrial. The court also considered the standard set forth in United States v. Wallach
(C.A.2 1992), 979 F.2d 912, in which the court held that where a defendant had suffered "no impairment" of his valued right to have his trial completed by a single tribunal retrial is barred only where the misconduct of the prosecutor is undertaken to prevent an acquittal that the prosecutor believed was likely to occur in the absence of such misconduct. Ultimately, the court concluded that a prosecutor's misconduct, no matter how egregious, will not bar a subsequent retrial as long as the prosecutor did not act with the specific intent either to inspire a motion for a mistrial, or to obtain a conviction where an acquittal was likely.
 {¶ 26} Accord State v. Loza, 71 Ohio St.3d 61, 70, 1994-Ohio-409,641 N.E.2d 1082. "Only where the prosecutorial conduct in question is intended to `goad' the defendant into moving for a mistrial may defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." Mere negligence will not suffice to show intent to provoke a mistrial.State v. Girts (1997), 121 Ohio App.3d 539, 553, 700 N.E.2d 395.
 {¶ 27} The trial court's finding regarding whether the prosecuting attorney *Page 11 
intended to cause a mistrial is a finding of fact which is accorded great deference. Oregon v. Kennedy, 456 U.S. at 675. A reviewing court may consider the following factors in determining whether the required intent to provoke a mistrial existed: (1) whether there was a sequence of overreaching prior to the single prejudicial incident; (2) whether the prosecutor resisted or was surprised by the defendant's motion for a mistrial; and (3) the findings of the trial and appellate courts concerning the intent of the prosecutor. State v. Girts, supra.
 {¶ 28} A hearing is necessary only if there existed a genuine issue in the mind of the trial court concerning the prosecutor's intent.United States v. Wentz (C.A. 4 1986), 800 F.2d 1325.
 {¶ 29} After reviewing the record, we find no plain error in proceeding to the second trial. The record reveals that the prosecuting attorney believed that Randleman had made the oral statement about defendant's fears of discovery of the gun to investigating officers, and that he believed that he could impeach Randleman with the prior statement under Evid.R. 607. Moreover, there is absolutely no indication of an intent to goad the defense into moving for a mistrial, no evidence of a sequence of overreaching prior to this incident, and the prosecutor resisted or was surprised by the defendant's motion for a mistrial. Likewise, the record reveals that the prosecuting attorney believed that Pomales' out-of-court statement was not hearsay, and offered it to show the subsequent conduct of officers in relation to Randleman and her car. There is absolutely no indication of an intent to goad the *Page 12 
defense into moving for a mistrial, no evidence of a sequence of overreaching prior to this incident, and the prosecutor resisted or was surprised by the defendant's motion for a mistrial. The prosecutor's actions did not operate to bar the retrial as the prosecutor did not act with the specific intent either to inspire a motion for a mistrial, or to obtain a conviction where an acquittal was likely.
 {¶ 30} The first assignment of error is without merit.
 {¶ 31} For his second assignment of error, defendant asserts that the trial court erred in refusing to suppress the eyewitness testimony of Trisha Smith because, he claims, the identification was the result of unnecessarily suggestive pretrial identification procedures. Specifically, defendant complains that Smith was shown a photo array which featured a photo of defendant with a darker complexion than the other subjects.
 {¶ 32} When a witness has been confronted with a suspect before trial, due process requires a court to suppress an identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances. State v. Waddy (1992), 63 Ohio St.3d 424, 438,588 N.E.2d 819, citing Manson v. Brathwaite (1977), 432 U.S. 98, 116,97 S.Ct. 2243, 2254, 53 L.Ed.2d 140, 155, and Neil v. Biggers (1972),409 U.S. 188, 196-198, 93 S.Ct. 375, 381-382, 34 L.Ed.2d 401, 410-411.
 {¶ 33} The defendant bears the initial burden of establishing that the photographic identification procedure was unnecessarily suggestive. If the *Page 13 
defendant meets this burden, the court must consider whether the procedure was so unduly suggestive as to give rise to irreparable mistaken identification. State v. Wills (1997), 120 Ohio App.3d 320,324-325, 697 N.E.2d 1072, citing Manson v. Brathwaite, supra.
 {¶ 34} The court must determine whether the photographic identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."Simmons v. United States (1968) 390 U.S. 377, 384, 19 L.Ed.2d 1247,88 S. Ct. 967.
 {¶ 35} However, no due process violation will be found where an identification is instead the result of observations at the time of the crime and does not stem from an impermissibly suggestive confrontation.Coleman v. Alabama (1970), 399 U.S. 1, 5-6, 90 S.Ct. 1999, 2001,26 L.Ed.2d 387, 394.
 {¶ 36} A court must consider the following factors with regard to potential misidentification: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation * * *." Neil v.Biggers, supra. (1972), 409 U.S. 188, 199-200, 34 L.Ed.2d 401,93 S.Ct. 375. The court must review these factors under the totality of the circumstances. Id. Even if the "identification procedure may have contained notable flaws, this factor does not, per se, preclude the admissibility of the identification." State v. Merrill *Page 14 
(1984), 22 Ohio App.3d 119, 121, 489 N.E.2d 1057; State v. Moody (1978)55 Ohio St.2d 64, 67, 377 N.E.2d 1008.
 {¶ 37} In this matter, we cannot conclude that the trial court erred in denying the motion to suppress. The evidence demonstrated that immediately following the shooting, Smith described the assailant as a dark complexioned African-American male, approximately 5'6" or 5'5", with dread locks or braids. Smith believed that she saw the man again at Reyes' wake. In the ensuing weeks, she looked at approximately twenty photographs for police but could not identify the assailant. In May 2003, she was shown a six-person photo array and indicated that defendant looked like the person but she could not be sure. All of the foregoing strongly suggests that Smith's identification is instead the result of observations at the time of the crime. Moreover, there is nothing to indicate that the identification procedure was unnecessarily suggestive. A six-person black and white photo array was presented. The men have comparable facial hair, and hair styles. We cannot accept defendant's claim that his complexion is darker than the others so as to isolate his identity and we also reject defendant's contention that his photo is the only one consistent with Smith's description. The photo array was well-constituted and not impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.
 {¶ 38} This assignment of error is without merit.
 {¶ 39} For his third assignment of error defendant asserts that the trial court *Page 15 
violated his rights under the Confrontation clause by determining that she was unavailable under Evid.R. 804, and permitting the state to introduce Randleman's testimony at the first trial.
 {¶ 40} A testimonial statement from a witness who does not appear at trial is inadmissible against the accused unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witnessed. Crawford v. Washington (2004), 541 U.S. 36,124 S. Ct. 1354, 158 L.Ed. 2d 177. Evid. R. 804(A)(5) defines the initial requirement of unavailability in the following manner:
 {¶ 41} "`Unavailability as a witness' includes situations in which the declarant:
 {¶ 42} "(5) is absent from the hearing and the proponent of his statement has been unable to procure his attendance (or in the case of a hearsay exception under subdivision (B)(2), (3), or (4), his attendance or testimony) by process or other reasonable means. * * *"
 {¶ 43} A witness is not considered unavailable unless the prosecution has made reasonable efforts in good faith to secure his presence at trial. State v. Keairns (1984), 9 Ohio St.3d 228, 230, 460 N.E.2d 245. "A showing of unavailability under Evid.R. 804 must be based on testimony of witnesses rather than hearsay not under oath unless unavailability is conceded by the party against whom the statement is being offered." Id. at 232.
 {¶ 44} In this matter, Randleman was under subpoena and a bench warrant was issued for her appearance at trial but she was absent from the proceedings. *Page 16 
The prosecuting attorney was unable to procure her appearance and he played a voice mail message from Randleman for the trial court in chambers in which Randleman indicated that she had received her subpoena and was aware of the court date but expressed notice, transportation and other issues. In another phone call to the attorney's personal cell phone, she indicated that she would be available on Tuesday and needed a ride. The prosecutor then related that the Elyria Police and Sheriff's Deputies had gone to her home on numerous times to locate her, and spoke to a woman taking care of Randleman's children who stated that she did not know when Randleman would return. The record supports the trial court's finding that the state did make a reasonable good-faith effort, including numerous attempts by law enforcement, to secure her appearance. Cf. State v. Smith (1990), 49 Ohio St.3d 137, 551 N.E.2d 190
Although the state's evidence was not under oath, defense counsel does not appear to have objected to the informal in chambers proceeding.
 {¶ 45} In any event, we conclude that admission of this evidence was harmless beyond a reasonable doubt in light of the actual evidence linking defendant to the home at 1371 East 185th Street and linking the murder weapon to this address, the evidence of defendant's fingerprints on Reyes' car, and the identification evidence. Cf. State v. Coma (August 14, 2000), Columbiana App. No. 99.
 {¶ 46} This assignment of error is overruled.
 {¶ 47} For his fourth assignment of error, defendant complains that his *Page 17 
convictions are not supported by sufficient evidence.
 {¶ 48} When reviewing the sufficiency of the evidence, an appellate court's function is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v.Thompkins (1997), 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id.
 {¶ 49} The essential elements of felony murder are set forth in R.C.2903.01(B) as follows:
 {¶ 50} "(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape."
 {¶ 51} The elements of aggravated robbery are set forth in R.C.2911.01 as follows:
 {¶ 52} "(A) No person, in attempting or committing a theft offense * * * shall do any of the following: * * * (3) Inflict or attempt to inflict, serious physical harm on another." *Page 18 
 {¶ 53} The Supreme Court has repeatedly rejected the argument that there is no aggravated robbery when the victim's property is taken after he is murdered. The court has stated:
 {¶ 54} "[T]he victim of a robbery, killed just prior to the robber's carrying off [his] property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation. A robber cannot avoid the effect of the felony-murder rule by first killing a victim, watching [him] die, and then stealing [his] property after the death."
 {¶ 55} State v. Smith (1991), 61 Ohio St.3d 284, 290, 574 N.E.2d 510. Accord State v. Rojas, 64 Ohio St.3d 131, 139, 1992-Ohio-110,592 N.E.2d 1376.
 {¶ 56} In this matter, the state's evidence demonstrated that defendant chased Reyes down and shot and killed him then fled in Reyes' car. The car was stripped of its rims and defendant's fingerprints were found on the fender, despite defendant's statement to police that he did not know Reyes and had never seen his car. In a prior arrest, defendant was also linked to 1371 East 185th Street, the location from which the murder weapon was recovered. In light of the foregoing, we conclude that this evidence, if believed, would convince the average mind of defendant's guilt of the offenses beyond a reasonable doubt. Cf.State v. Scott, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133.
 {¶ 57} This assignment of error is without merit.
 {¶ 58} For his fifth assignment of error defendant complains that his *Page 19 
convictions are against the manifest weight of the evidence.
 {¶ 59} In evaluating a challenge to the verdict based on manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.State v. Thompkins, supra. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id. at 387.
 {¶ 60} As explained by the Ohio Supreme Court:
 {¶ 61} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'" Id.
 {¶ 62} The evidence in this matter indicated that defendant was arrested at 1371 East 185th Street subsequent to the instant offense, and the owner of this home found the weapon used to kill Reyes hidden in his grill. The evidence also indicated that defendant was identified as the assailant, that his fingerprints were *Page 20 
found on Reyes' car, and that the car was stripped of its specialty rims. From the foregoing, we cannot say that the jury lost its way in convicting defendant of the offenses. This claim is without merit
 {¶ 63} For his sixth assignment of error, defendant asserts that the State of Ohio violated his constitutional rights to equal protection by using its preemptory challenges to strike African-American jurors.
 {¶ 64} In Batson v. Kentucky (1986) 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits the use of peremptory challenges in a discriminatory manner to exclude potential jurors solely on account of their race. Batson created a three-part test for determining whether a prosecutor's use of a peremptory challenge is racially motivated. First, a defendant must make a prima facie showing of intentional discrimination by demonstrating that the state has used peremptory challenges to exclude potential jurors on the basis of race. Id. at P31. The defendant must point to facts and relevant circumstances which raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race. Id.; see, also,State v. Jordan, 167 Ohio App.3d 157, 2006-Ohio-2759, 854 N.E.2d 520, citing Batson.
 {¶ 65} Once a defendant makes a prima facie case of discrimination, the burden shifts to the state to provide a race-neutral explanation for the peremptory challenge. Id., citing Hernandez v. New York (1991),500 U.S. 352, 111 S.Ct. 1859, *Page 21 114 L. Ed. 2d 395. "The state's explanation need not rise to the level of a `for cause' challenge; rather, it need only be based on a juror characteristic other than race and not be pretextual." Id. The issue is the facial validity of the prosecutor's explanation; unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. See Purkett v. Elem (1995),514 U.S. 765, 767-768, 115 S. Ct. 1769, 1771, 131 L.Ed.2d 834, quotingHernandez v. New York, supra.
 {¶ 66} The court's finding that the state had no discriminatory intent in excluding the juror will not be reversed unless it is clearly erroneous. State v. Hernandez (1992), 63 Ohio St. 3d 577, 582,589 N.E.2d 1310, 1313.
 {¶ 67} In this matter, the state used a preemptory to strike Juror Jeffries, an African-American. The state explained that she stated that she did not want to be there, (see Tr. 3433, 3438), and she had a problem putting people in jail. This was a race-neutral explanation, and there was no showing of pretext. Another African-American remained on the panel. We find no error in connection with this preemptory challenge.
 {¶ 68} For his seventh assignment of error defendant asserts that the trial court erred in failing to conduct an in-camera review of Det. Beamon's report pursuant to Crim.R. 16(B)(1)(g).
 {¶ 69} Those portions of police reports recording the officer's personal observations and recollections of the events are subject to scrutiny under Crim.R. *Page 22 
16(B)(1)(g); State v. Jenkins (1984), 15 Ohio St.3d 164, 473 N.E.2d 264. Those portions which recite matters beyond the witness' personal observations, such as notes regarding another witness' statement or the officer's investigative decisions, interpretations and interpolations, are privileged and excluded from discovery under Crim.R. 16(B)(2). Id.
 {¶ 70} Before a writing can be considered a witness's "statement," it must be demonstrated that the witness prepared, signed, or adopted the statement or that it is a continuous narrative made by the witness.State v. Cummings (1985), 23 Ohio App. 3d 40, 491 N.E.2d 354. Reports or notes taken by a police officer during an interview with a victim or witness in a case are not considered a statement for the purposes of Crim.R. 16(B)(1)(g) and are not subject to an in camera inspection within the meaning of Crim.R.16(B)(1)(g). State v. Washington (1978),56 Ohio App. 2d 129, 381 N.E.2d 1142; State v. Watts (June 4, 1998), Cuyahoga App. No. 72863; State v. Spraggins, Cuyahoga App. No. 87256,2006-Ohio-739. The Washington Court noted that "* * * the word `written' in this context does not refer to notes made by a detective talking to a witness during an investigation. The word `written' refers to a writing made by a witness or by somebody else at the witness' direction."56 Ohio App.2d at 132-133. See, also, State v. Henry (1987),37 Ohio App. 3d 3, 523 N.E.2d 877.
 {¶ 71} In this matter, there is no indication that the documents at issue constitute "statements" within the contemplation of Crim.R. 16. Det. Beamon was *Page 23 
not present at the scene of the shooting, and the documents at issue were not his statement or narrative. There is absolutely no indication that the officer was present for any of the defendant's conduct or that he made any observations pertaining to the actual commission of the offense. Rather, the officer became involved with this matter after commission of the offenses and in the months following the shooting, he spoke to witnesses regarding the witnesses' observations. The documents are investigative reports and not witness statements.
 {¶ 72} Defendant herein relies upon Spraggins, supra for support herein. In that case, the officer whose statement was at issue was a member of the unit that participated in the "buy/bust" of the defendant, was present for the transaction at issue and made personal observations of the defendant's conduct. Spraggins is therefore completely distinguishable from this matter.
 {¶ 73} Insofar as the defense sought to review the statement because the detective used it to refresh his recollection, the trial court was vested with discretion in making this ruling, Evid.R. 612, and we find no abuse of discretion as the trial court determined that those portions were turned over to the defense. (Tr. 4200).
This claim lacks merit.
 {¶ 74} For his eighth assignment of error, defendant claims that the trial court erroneously instructed the jury as to the offense of aggravated robbery. Specifically, he challenges that portion which indicate that the violent act "must occur as part of the sequence of acts leading up to, occurring during or immediately subsequent to *Page 24 
armed robbery and that the death was associated with the armed robbery."
 {¶ 75} As an initial matter, we note that this portion of the instruction pertained to the charge of attempted aggravated robbery. We further note that no error was recognized in connection with this instruction in State v. Andrews (May 4, 1995), Cuyahoga App. No. 67370.
 {¶ 76} We reject this claimed error.
 {¶ 77} Within his ninth assignment of error, defendant asserts that his trial counsel was ineffective for failing to object to the aggravated robbery instruction. As we have rejected the underlying challenge to the jury instruction, the claim of error premised thereon must likewise fail. State v. Henderson (1988), 39 Ohio St.3d 24, 33,528 N.E.2d 1237.
 {¶ 78} For his tenth assignment of error, defendant maintains that the trial was tainted by prosecutorial misconduct.
 {¶ 79} The test for prosecutorial misconduct is whether the prosecutor's conduct at trial was improper and prejudicially affected the substantial rights of the defendant. State v. Lott (1990),51 Ohio St.3d 160, 165, 555 N.E.2d 293. A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19, 24,514 N.E.2d 394. To determine if the alleged misconduct resulted in prejudice, an appellate court should consider the following factors: "(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions *Page 25 
were given by the court, and (4) the strength of the evidence against the defendant." State v. Braxton (1995), 102 Ohio App.3d 28, 41,656 N.E.2d 970. Additionally, the appellate court should consider whether the alleged misconduct was "an isolated incident in an otherwise properly tried case." Id.
 {¶ 80} Defendant complains that the prosecuting attorney noted that he was unemployed, that he breaks into houses, that the jurors should use their common sense in evaluating eyewitness identification, and that he misrepresented the evidence of record.
 {¶ 81} The reference to a defendant's unemployed status was determined not to amount to prejudicial prosecutorial misconduct in State v.Siler, Ashland App. No. 02 COA 028, 2003-Ohio-5749; vacated on other grounds Siler v. Ohio (2004), 543 U.S. 1019, 125 S.Ct. 671,160 L.Ed.2d 494.
 {¶ 82} The comment that defendant breaks into houses had only a loose association to the evidence as the state demonstrated that defendant was arrested following a report of a break-in. We cannot conclude that this isolated comment prejudicially affected defendant's substantial rights, as the jury was repeatedly informed that the comments were not evidence.
 {¶ 83} The reference to jurors using their common sense has been determined to be neither prosecutorial misconduct nor plain error. SeeToledo v. Moore, Lucas App. No. L-02-1288, 2003-Ohio-2362.
 {¶ 84} As to the claims that the prosecutor committed misconduct by distorting *Page 26 
evidence of record, we note that Dabney's fingerprints were evaluated (Tr. 4231), the similarity of the rims taken from Reyes and later put on Randleman's car was established, both Smith and Maynard did identify defendant as the assailant. We therefore are unable to conclude that the prosecuting attorney caused prejudicial error in connection with these remarks. Cf. State v. Daoud, Montgomery App. No. 19213, 2003-Ohio-676.
 {¶ 85} We reject this assignment of error.
 {¶ 86} For his eleventh assignment of error, defendant asserts that the trial court erred in failing to permit his trial counsel to argue the existence of residual doubt in the penalty phase of the trial.
 {¶ 87} In Franklin v. Lynaugh (1988), 487 U.S. 164, 188,108 S.Ct. 2320, 2335, 101 L.Ed.2d 155, 175, the Court held that states are not required to allow a defendant the opportunity to argue residual doubt as a mitigating circumstance. The court stated that residual doubt did not have to be considered as a mitigating factor because it was not relevant to the defendant's character, record, or any circumstances of the offense. Accord State v. McGuire, 80 Ohio St.3d 390, 1997-Ohio-335,686 N.E.2d 1112.
 {¶ 88} For his final assignment of error, defendant asserts that the trial court violated his right to remain silent when it noted in the sentencing hearing that defendant had not accepted responsibility for his conduct. He further complains that the trial court should have considered lesser sentencing alternatives before *Page 27 
fashioning the sentence in this matter.
 {¶ 89} A defendant's silence may not be used against him in fashioning a sentence. Mitchell v. United.States (1999), 526 U.S. 314,119 S.Ct. 1307, 143 L.Ed.2d 424.
 {¶ 90} In this matter, however, defendant did not exercise hisFifth Amendment right to remain silent at the sentencing hearing. Instead, he voluntarily responded when the judge gave him the opportunity to speak prior to sentencing. Moreover, the record clearly reflects that the court's determination that defendant did not accept responsibility was a reference to this pre-sentence statement.
 {¶ 91} As to defendant's claim that the trial court did not consider lesser options before imposing the sentence herein, we note that inState v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, the court specifically held that "after the severance, judicial fact-finding is not required before a prison term may be imposed within the basic ranges of R.C. 2929.14(A) based upon a jury verdict or admission of the defendant." As a result, "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings and give reasons for imposing maximum, consecutive or more than the minimum sentence." Id. at paragraph seven of the syllabus, andState v. Mathis, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, paragraph three of the syllabus.
 {¶ 92} By application of all of the foregoing, this assignment of error is overruled. Affirmed. *Page 28 
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 ANTHONY O. CALABRESE, JR., P.J., and MARY EILEEN KILBANE, J., CONCUR. *Page 1