**[Cite as *State v. Truhlar*, 2016-Ohio-3453.]**

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103312**

## STATE OF OHIO

PLAINTIFF-APPELLANT/
CROSS-APPELLEE

vs.

## MATTHEW TRUHLAR

DEFENDANT-APPELLEE/
CROSS-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

Criminal Appeal from the
Cuyahoga County Common Pleas Court
Case No. CR-13-576248-A

**BEFORE:** Boyle, J., E.T. Gallagher, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** June 16, 2016

**ATTORNEYS FOR APPELLANT/**
**CROSS-APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Brett Hammond
          Amy Venesile
Assistant County Prosecutors
Justice Center
1200 Ontario Street
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE/**
**CROSS-APPELLANT**

Russell S. Bensing
1360 East 9th Street
Suite 600
Cleveland, Ohio   44114

MARY J. BOYLE, J.:

{¶1}  Plaintiff-appellant, state of Ohio, appeals from a judgment dismissing its case against defendant-appellee, Matthew Truhlar, with prejudice.   The state raises four assignments of error for our review:

1.  The trial court abused its discretion when it dismissed the state's case.

2.  To the extent that the trial court dismissed this case with prejudice based on a claim of pre-indictment delay, the trial court abused its discretion.

3.  The trial court abused its discretion by failing to hold a full hearing on defendant's motion for pre-indictment delay.

4.   The trial court abused its discretion when it concluded that St. Vincent's Charity utterly failed to exercise due diligence and attributed that lack of due diligence to the state.

{¶2}  Truhlar cross-appeals, raising one assignment of error, arguing that the trial court erred in denying his motion for mistrial.

{¶3}  After review, we find merit to the state's first assignment of error in part, i.e., we agree that the trial court should not have dismissed the case *with prejudice*.   We further find Truhlar's cross-assignment of error moot as the trial court already granted Truhlar's motion for mistrial.

I.   **Procedural History and Factual Background**

{¶4}  In July 2013, Truhlar was indicted on four counts: one count of rape in violation of R.C. 2907.02(A)(2), one count of gross sexual imposition in violation of R.C.

2907.05(A)(1), and two counts of kidnapping in violation of R.C. 2905.01(A)(2) (with a sexual motivation specification) and 2905.01(A)(4). He pleaded not guilty to the indictment.

{¶5} The charges stemmed from an alleged rape that the victim reported to her parents and police in July 1993; the victim was 15 years old at that time. A rape kit was collected at St. Alexis Hospital within several hours of the alleged attack. The victim did not know her attacker. In April 2013, the Ohio Bureau of Criminal Identification and Investigation ("BCI") found that DNA collected as part of the victim's rape kit matched Truhlar's DNA. Truhlar was subsequently indicted one day before the 20-year statute of limitations had run.

{¶6} Before trial, Truhlar moved to dismiss the indictment against him based on preindictment delay. The trial court denied his motion, finding that Truhlar had not established that he was actually prejudiced by the delay.

{¶7} Before trial, Truhlar waived his right to a jury trial. The following facts were presented to the bench.

{¶8} At trial, the state presented three witnesses: the victim, the police officer who interviewed the victim in 1993, and a special investigator for the state who "is involved in the CODIS cold case initiative." The victim testified that on the day of the rape, she walked to a convenience store around 5:00 p.m. After she left the store, she started walking home "the long way around" to be "out longer." She said that she turned left on Track Road, which was about three city blocks from her house. While she was

walking on Track Road, an unknown male grabbed her from behind. She recalled the male taking her to "a field." Once at the field, the male "stuck his penis in [her] vagina" against her will. The victim could not recall if her attacker touched her anywhere else. The victim kicked the male in his groin and was able to get away.

{¶9} After the victim got away, she went home. Her father asked her what took her so long. The victim told her parents that she was raped. They took her to the emergency room at St. Alexis Hospital, where a rape kit was collected. After the rape, she moved to Michigan with her parents. She could not remember anything else about the attack or the circumstances surrounding the attack.

{¶10} The victim met with Nicole DeSanto, a special investigator from the Cuyahoga County Prosecutor's Office, in July 2013 in Michigan, where she still lived. Investigator DeSanto showed the victim a photo array that included Truhlar's photo, but the victim could not identify anyone in the photo array.

{¶11} On cross-examination, the victim testified that she told Investigator DeSanto that she was a victim in two other incidents in Ohio. The victim said that a couple of years before the rape, she and her friend, Kimberly Kramer, were kidnapped by two Albanian men. The victim said that she and Kramer were held hostage for nine days by the two men. She could recall that the men gave her water and crackers, but she could not recall much of anything else. The victim said that she had to testify against the Albanian men, but she could not recall any other details of the case or hearing.

{¶12} The victim also told Investigator DeSanto that she ran away from home when she was 15 years old, but she could not recall if it was before or after the alleged rape in this case. The victim said that she ran away because of family problems. When she went back to her parents' home, her father was not happy with her. She told her father that her boyfriend at that time had hit her and kidnapped her.

{¶13} Officer Shelly Patena testified that she responded to St. Alexis Hospital in July 1993, and was responsible for authoring the initial report and collecting the rape kit. Officer Patena identified a report that she had authored regarding the alleged rape. Officer Patena did not have any independent recollection of the report, but after reading her report, she recalled some things. The report indicated that the rape occurred at "Track and Victor Avenue." The victim described her attacker as "wearing a black T-shirt, had brown, long hair with a long ponytail and a tattoo on the forearm." The report further indicated that one of the victim's family members gave the name of a possible suspect, Cecil Terkowski.

{¶14} Investigator DeSanto testified that her office received a "hit letter" indicating that Truhlar's DNA that had been taken in 2002 matched the DNA taken from the rape kit provided by the victim in this case.

{¶15} Investigator DeSanto obtained a HIPPA release from the victim to acquire the victim's medical records. But Investigator DeSanto explained that she had not been able to procure the records. St. Alexis Hospital had closed; St. Vincent Charity Hospital

was now the custodian of records for St. Alexis Hospital. But St. Vincent Charity Hospital could not find the victim's medical records.

{¶16} Investigator DeSanto testified that she was not able to find any information regarding the victim's alleged kidnapping by Albanians.

{¶17} Investigator DeSanto met with Truhlar. She showed him a photo of the victim. He said that he did not recognize her, nor did he have any "consensual acts" with the victim. Truhlar gave Investigator DeSanto many possible alibis. Truhlar told Investigator DeSanto that he would have been with his wife at the time of the alleged rape because his wife had just had a baby. He also told Investigator DeSanto that he was not sleeping around at that time because he was married. He also said that in July 1993, he worked 4:00 p.m. to midnight Monday through Friday, so he would have been working at the time of the alleged rape. Truhlar further told Investigator DeSanto that he had "lost a partial thumb" at work, and he would have been in a cast at the time of the alleged rape.

{¶18} Investigator DeSanto testified that she spoke with Truhlar's ex-wife. She had a baby in July 1993, but it was two days before the alleged rape. Truhlar's ex-wife could not verify that Truhlar was at the hospital at the time of the rape. Investigator DeSanto also could not verify any of Truhlar's other alibis.

{¶19} At the close of the state's case, Truhlar moved for a Crim.R. 29 acquittal. The trial court granted it as to the gross sexual imposition count, but denied it as to all other counts.

**{¶20}** Kimberly Kramer testified for Truhlar that in 1993, she and the victim were best friends. She testified that the "Albanian kidnapping" never occurred.

**{¶21}** Truhlar testified that he had met the victim at the Boys and Girls Club. He said that he was an instructor and she was a student. Truhlar testified that the day before the alleged rape, he was playing basketball at Willow School. He was approached by a female named "Sue."[1] He and "Sue" flirted and kissed that day. Truhlar and "Sue" planned to meet again at the school on the following day, which Truhlar said they did. This time, Truhlar said that they had sex in a hidden doorway to the school. They met one more time after that for approximately five minutes, where they talked about "Sue" moving. Truhlar said the school is "two blocks or less" from Track Road.

**{¶22}** Truhlar stated that he never had brown hair or a ponytail.

**{¶23}** On cross-examination, Truhlar agreed that his thumb was partially cut off in October 1992, and that the last surgery he had on his thumb was four months prior to July 1993. He agreed that he got tattoos on his forearms in 1992, when he was 18 years old.

**{¶24}** At the close of all of the evidence, Truhlar moved for a Crim.R. 29 acquittal on the remaining counts that the trial court denied. After the court heard closing arguments on June 17, 2015, it took the case under advisement.

**{¶25}** Five days after the trial ended, on June 22, 2015, the state moved to "supplement the trial record" with the victim's medical records. In its motion, the state

---

[1]Sue is not the name testified to by Truhlar. The name that Truhlar testified to was the victim's actual middle name, which we will not use here. Instead, we use "Sue" for the ease of discussion.

indicated that the prosecutor's office received the records on June 17, 2015, but the prosecutor on the case did not actually receive them until June 19, 2015.

{¶26} Following the state's motion, Truhlar moved for a mistrial and also renewed his motion for preindictment delay.

{¶27} The trial court held a hearing on the pending motions in August 2015. At the close of the hearing, the trial court stated, "at this point, I'm going to declare a mistrial in this matter." It explained that there had been multiple delays in the case due to the state trying to obtain the victim's medical records. The trial court found the matter to be "ridiculous" and deprived Truhlar of a fair trial. The trial court then stated: "And because of the length of delay in this matter, the fact that it goes back to 1993, the fact that I just find this to be borderline egregious as far as the deprivation, I'm going to grant the mistrial and dismiss the matter with prejudice."

{¶28} In its judgment entry, the court stated that the case was "dismissed with prejudice. Hearing held on the defendant's motion for mistrial." It then stated:

> The court heard testimony and evidence regarding the victim's medical records. Following nearly two years of requests to St. Vincent Charity Hospital the records of the alleged victim showed up in the prosecutor's office near the conclusion of trial in this matter. The court finds that the defendant, in looking at the totality of the circumstances in this matter, was deprived of a fair trial. This case has been pending for two years (indicted 7/23/13) and a major reason for the delay in reaching trial was the lack of medical records. The court finds that St. Vincent Charity Hospital, via its own employees and through its contracted agent, Healthport, utterly failed to exercise due diligence in obtaining the medical records sought by the state of Ohio.
>
> As a result, the defendant suffered delay in his case and was prejudiced by being unable to cross-examine the victim at trial via her medical records, or

to utilize any potentially exculpatory evidence contained in the records. This, coupled with the delay in bringing this prosecution due to failure to submit the rape kit for testing by officers of the Cleveland Police Department in a timely manner, has created a situation wherein justice demands dismissal of the action.

Although the court finds that the state of Ohio did exercise due diligence in attempting to obtain the records, the actions of St. Vincent Charity Hospital and Healthport are attributed to the state, which has the burden of proof in this and any criminal prosecution. As a result, given the fact that a bench trial has already taken place, the dismissal of this matter is with prejudice.

**{¶29}** It is from this judgment that the state appeals and Truhlar cross- appeals.

## II.  Mistrial

**{¶30}** In its first assignment of error, the state argues that the trial court erred when it dismissed the case with prejudice "based on the state's misconduct."  We point out that the crux of the state's argument here is *not* that the trial court erred when it dismissed the case, but that it erred by dismissing the case *with prejudice*.  Relevant to this discussion is the state's fourth assignment of error, where it argues that the trial court erred when it "concluded that St. Vincent's Charity utterly failed to exercise due diligence and attributed that lack of due diligence to the state."  Because these two assigned errors are inextricably intertwined, we will address them together.  In these two arguments, the state maintains that the dismissal should have been without prejudice.  We agree.

**{¶31}** In this case, the trial court granted Truhlar's motion for mistrial after holding a hearing on the matter.  The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse

of discretion.  *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001), citing Crim.R. 33, and *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987).

**{¶32}** When reviewing matters that are within the trial court's discretion, we must keep in mind that "'[t]he term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations.'"  *State v. Jenkins*, 15 Ohio St.3d 164, 222, 473 N.E.2d 264 (1984), quoting *Spalding v. Spalding*, 355 Mich. 382, 384-385, 94 N.W.2d 810 (1959).   To find that a trial court abused that "choice, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254, 256, 662 N.E.2d 1 (1996).

**{¶33}** The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, protects a criminal defendant from multiple prosecutions for the same offense.  *Oregon v. Kennedy*, 456 U.S. 667, 671, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

**{¶34}** The Double Jeopardy Clause does not, however, bar reprosecution in every case.   Where a defendant requests a mistrial, double jeopardy does not bar a retrial unless the defendant's request for a mistrial is precipitated by prosecutorial misconduct intended to provoke a defendant into seeking a mistrial.   *N. Olmsted v. Himes*, 8th Dist. Cuyahoga Nos. 84076 and 84078, 2004-Ohio-4241, ¶ 36-37.

**{¶35}** As this court explained in *Himes*:

Generally, there are no double jeopardy considerations when a mistrial is declared. *State v. Gaines*, 8th Dist. Cuyahoga No. 82301, 2003-Ohio-6855. If a defendant's motion for mistrial is granted, or the trial court sua sponte declares a mistrial, the state is usually not precluded from retrying a criminal defendant. *United States v. Tateo* (1964), 377 U.S. 463, 467, 12 L.Ed.2d 448, 84 S.Ct. 1587; *State v. Loza* (1994), 71 Ohio St.3d 61, 70, 1994-Ohio-409, 641 N.E.2d 1082.

However, a narrow exception to this rule applies when the defendant's request or the judge's actions are prompted or instigated by prosecutorial misconduct designed to goad the defendant into seeking a mistrial. *Oregon v. Kennedy*, 456 U.S. at 676; *State v. Glover* (1988), 35 Ohio St.3d 18, 517 N.E.2d 900.

"Prosecutorial misconduct, by itself, is not enough to trigger the exception to the Double Jeopardy Clause — the state must intend 'to subvert the protections afforded by the Double Jeopardy Clause.' *Kennedy*, *supra*, 456 U.S. at 675. In other words, only conduct 'intentionally calculated to cause or invite mistrial' will bar retrial. *United States v. Thomas* (C.A.6, 1984), 728 F.2d 313, 318." *State v. Girts* (1997), 121 Ohio App.3d 539, 551, 700 N.E.2d 395.

*Id*. at ¶ 36-38.

**{¶36}** In this case, the state did not invite a mistrial. Indeed, the state opposed a mistrial. We find no abuse of discretion, however, in the trial court imputing the hospital's lack of due diligence to the state (the state's argument in its fourth assignment of error). The trial court was correct that the state has the ultimate burden to prove its case against Truhlar. Nonetheless, there is nothing in the record that indicates in any way that the state intended to goad Truhlar into requesting a mistrial. Thus, we agree with the state that the trial court's granting a mistrial — at Truhlar's request — should have been without prejudice.

**{¶37}** Alternatively, the state argues that the "trial court could have opted to allow the parties to reopen the case," rather than dismiss it.   In support of this argument, the state cites to R.C. 2945.10 and cases applying this statute.   This provision sets forth "order of proceedings of trial," and states in its entirety:

> The trial of an issue upon an indictment or information shall proceed before the trial court or jury as follows:
>
> (A) Counsel for the state must first state the case for the prosecution, and may briefly state the evidence by which the counsel for the state expects to sustain it.
>
> (B) The defendant or the defendant's counsel must then state the defense, and may briefly state the evidence which the defendant or the defendant's counsel expects to offer in support of it.
>
> (C) The state must first produce its evidence and the defendant shall then produce the defendant's evidence.
>
> (D) The state will then be confined to rebutting evidence, but the court, for good reason, in furtherance of justice, may permit evidence to be offered by either side out of its order.
>
> (E) When the evidence is concluded, one of the following applies regarding jury instructions:
>
>> (1) In a capital case that is being heard by a jury, the court shall prepare written instructions to the jury on the points of law, shall provide copies of the written instructions to the jury before orally instructing the jury, and shall permit the jury to retain and consult the instructions during the court's presentation of the oral instructions and during the jury's deliberations.
>>
>> (2) In a case that is not a capital case, either party may request instructions to the jury on the points of law, which instructions shall be reduced to writing if either party requests it.

(F) When the evidence is concluded, unless the case is submitted without argument, the counsel for the state shall commence, the defendant or the defendant's counsel follow, and the counsel for the state conclude the argument to the jury.

(G) The court, after the argument is concluded and before proceeding with other business, shall forthwith charge the jury. Such charge shall be reduced to writing by the court if either party requests it before the argument to the jury is commenced. Such charge, or other charge or instruction provided for in this section, when so written and given, shall not be orally qualified, modified, or explained to the jury by the court. Written charges and instructions shall be taken by the jury in their retirement and returned with their verdict into court and remain on file with the papers of the case.

The court may deviate from the order of proceedings listed in this section.

**{¶38}** This statute provides that a trial court *may* deviate from "the order of proceedings." But notably, whether a trial court does so is within its sound discretion. *Columbus v. Grant*, 1 Ohio App.3d 96, 97, 439 N.E.2d 907 (1981).

**{¶39}** Moreover, Evid.R. 611(A) states that:

The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

**{¶40}** Under this evidentiary rule, trial courts also have broad discretion and control over the order and proceedings of a trial. *State v. Presley*, 10th Dist. Franklin No. 02AP-1354, 2003-Ohio-6069, ¶ 44.

**{¶41}** Here, the trial court found that the state's request to supplement the record with the victim's medical records was "borderline egregious" in depriving Truhlar of a fair trial. The trial court noted that the case had been pending for over two years — in

large part due to the state being unable to obtain the victim's medical records. The state had rested, Truhlar had rested, and both parties had given closing arguments. After review, we simply cannot say that the trial court abused its "sound discretion" when it declined to allow the state to reopen its case to supplement the record with the victim's medical records. Nor can we say that the trial court acted "so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias" when it declined to do so. *Nakoff*, 75 Ohio St.3d at 256, 662 N.E.2d 1. As the Ohio Supreme Court noted, this deferential standard of review is hard to overcome. *See id.* And the state did not do so here.

{¶42} Thus, the state's first and fourth assignments of error are sustained in part and overruled in part.

{¶43} We further find that the state's remaining two assignments of error are without merit and summarily overruled as the trial court did not dismiss the case due to preindictment delay.

## III. Truhlar's Cross-Assignment of Error

{¶44} In his cross-assignment of error, Truhlar argues that the trial court erred when it denied his motion for mistrial. We find Truhlar's argument to be moot because as we previously stated, the trial court granted Truhlar's motion for mistrial.

{¶45} The confusion, however, may stem from the fact that the trial court did not state in its judgment entry that it granted Truhlar's motion for mistrial. Instead, it stated,

"Case is dismissed with prejudice. Hearing held on the defendant's motion for mistrial."

We can glean from the transcript of the hearing that the trial court granted Truhlar's motion for mistrial, but it failed to say so in its judgment entry. The trial court can correct this omission, however, by issuing a nunc pro tunc judgment entry to reflect what actually occurred at the hearing. *See State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 559, ¶ 30 (a judgment can be corrected nunc pro tunc to reflect what actually occurred at a hearing).

**{¶46}** Truhlar's cross-assignment of error is overruled.

**{¶47}** Judgment affirmed in part, reversed in part, and remanded. The judgment to dismiss the case is affirmed, but it is reversed with respect to dismissing the case with prejudice. This case is remanded to the trial court for it to issue a new judgment entry dismissing the case without prejudice. We further note that in issuing the new judgment entry, the trial court should also state via nunc pro tunc that it granted Truhlar's motion for a mistrial.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

MARY J. BOYLE, JUDGE

EILEEN T. GALLAGHER, P.J., and
MELODY J. STEWART, J., CONCUR